Bell, J.
 

 In the consideration of this case it should be noted at the outset that the defendant, appellant herein, offered no evidence as to car No. 132, its loading or the manner of plaintiff’s injury. Its evidence was confined to the introduction of the rule of the railroad company set forth in its answer, the nature and extent of plaintiff’s injuries, and the release.
 

 We- shall consider and determine the assignments of error presented in the chronological order as stated in the brief of appellant.
 

 Assignment 1. “The Common Pleas Court erred in overruling the defendant’s motion to arrest the testimony from the jury and enter judgment for the defendant made at the close of the plaintiff’s opening-statement; and also erred in overruling the defendant’s motion to arrest the testimony from the jury and enter judgment for the defendant made at the close of plaintiff’s evidence; and also erred in overruling the defendant’s motion to arrest the testimony from the jury and enter judgment for the defendant made at the close of all the evidence.”
 

 
 *150
 
 A motion for a directed verdict for defendant made at the conclusion of the opening statement by counsel for plaintiff: was overruled.
 

 A cause of action is alleged in the petition and the opening statement outlined the evidence by which the plaintiff expected to prove those allegations. The statement by plaintiff’s counsel as to the release executed by plaintiff was not such an improper statement as would necessitate the withdrawal of a juror and a continuance of the cause.
 

 At the conclusion of the plaintiff’s testimony defendant made a motion for an instructed verdict which was renewed at the conclusion of all the testimony. Both of these motions also-were overruled.
 

 The plaintiff offered in his case in chief the testimony of George James, yardmaster for the defendant at its yards at Lowellville, Ohio, where plaintiff was injured. James testified that the crew, of which plaintiff was foreman, worked under his orders as such yardmaster and that his office gave the orders to switch the cars on that morning, including car No. 132, from the receiving yard to the stockyard.
 

 Don Tindall, a yard brakeman employed by the Pittsburgh & Lake Erie Railroad Company in the crew of which plaintiff was foreman, testified as to the manner in which car No. 132 was loaded; that he was riding on the car immediately ahead of car No. 132; and that after plaintiff threw the switch for the cut to back into the stockyard plaintiff boarded the same car on which he was riding.
 

 Tindall’s exact testimony as to the actual happening of the accident is as follows:
 

 “Q. And in order to get on that riding platform he would then walk between the Erie gondola and this car of scrap, is that correct? A. Yes, that’s what I would say.
 

 “Q. And is that what he did? A. No. He didn’t get up on that platform at all.
 

 
 *151
 
 “Q. I just say was that what he was doing when the accident happened? A. Well, I have no way of knowing what he was attempting to do, but I saw him start around there.
 

 “Q. Well, he had climbed on the Erie car? A. Yes, and had one foot up.
 

 “Q. In between these two cars? A. Yes.
 

 “Q. Going'in the direction of the riding platform as you were standing or sitting on the riding platform, did you notice anything about the load of scrap on the Sharon Steel car? A. Just after Mr. Flynn got on the cars I noticed the load started to topple and I hollered and he was in a position to step from one car to another, and as I saw it I hollered ‘Look out, Art,’ and he jerked his foot off the other ear and this piece of scrap caught his foot.
 

 “Q. Had you seen this piece of scrap start to move? A. Yes, that’s why I hollered.
 

 “Q. Was it the piece of scrap on the top of the cone? A. Yes, it was cone shape estimated at nearly four hundred pounds.
 

 “Q. You had noticed it start to sway or move? A. It started to slide.
 

 “Q. Toward the pile of scrap toward the end of the car and in the direction of you and Mr. Flynn? A. Yes.”
 

 Plaintiff testified with regard to the accident as follows:
 

 “Q. After the créw had built up the ten ears you were to take, did you receive any further instructions from the yard master? A. I did. I received instructions from Mr. Parsons to also take a car that was first out on number two track, which was Sharon Steel car No. 132.
 

 “Q. Is that a car that had already been on number two track? A. That car was already on number two track.
 

 
 *152
 
 “Q. Your brakeman, as far as you knew, hadn’t switched that car in there? A. No.
 

 “Q. Did you convey that information to the brakeman? A. Yes.
 

 “Q. How did you do that? A. I told him we were instructed to take the company car with us.
 

 “Q. At that time were you still on the lead? A. I was up close to the engine.
 

 “Q. And I presume you gave the signal to pull out of the yard? Á. I did.
 

 “Q. As the train, this draft of cars you were on, pulled out of the yard, did you ride that draft of cars or engine? A. I rode the draft of cars about middle ways back.
 

 “Q. About middle ways back from the engine? A. Yes.
 

 “Q. Standing on the steps of the car? A. Standing on the steps of the car.
 

 “Q. Had you at any time got down in on number two track, yourself? A. No, I did not.
 

 “Q. How far did you ride the draft of cars coming up? A. I would say a distance of perhaps 1,500 feet.
 

 “Q. At any particular point? A. From this receiving yard to the cut-back switch.
 

 “Q. You rode the side of one of the cars up to the cut-back switch? A. Yes.
 

 “Q. Did you drop off there? A. I dropped off to throw that switch.
 

 “Q. When you say you dropped off there to throw the switch, tell the jury briefly as to what operation was necessary at that particular point? A. Well, as you pull up, this is an upgrade, and as you pull out it is necessary to throw the switch over as soon as the draft of cars get by so you can move the opposite direction.
 

 “Q. Am I right in saying you are coming up one side of the Y, and as soon as the cars pass this cuU
 
 *153
 
 back switch you throw the switch and give a signal and they come back again and that diverts them on the other side of the Y in the direction of the stockyard? A. That’s right.
 

 “Q. Now, after the draft of cars passed the cutback switch did you throw the switch? A. Yes.
 

 “Q. And the draft of cars started back again towards you? A. Yes.
 

 “Q. Tell us, in your own words, what happened then, what did you do? A. I made an attempt to get on the east end of the second car, due to the fact that the company car was first out and using our draft to ride, I made an attempt to get on the second car.
 

 “Q. Was that the first time you had seen or noticed this car that the crew had picked up, that was on number two track? A. That’s the first time I got to see the car.
 

 “Q. Were the cars moving past you then? A. They were.
 

 “Q. And you then climbed on the second car? A. Yes.
 

 “Q. All right, continue. A. I was attempting to get on top of the second car on the brake footboard, due to the fact we are instructed to ride the head end of all drafts of cars.
 

 “Q. It’s your duty to ride the front car? A. Yes.
 

 “Q. Was there anybody else on this second car? A. Yes. Mr. Tindall was on the brake footboard at the time.
 

 ‘ ‘ Q. That was the man working for you and the man that testified yesterday? A. Yes.
 

 ‘ ‘ Q. What, if anything, happened, as you were getting on the Erie car, the second car? A. As I was making my way up, trying to get on the footboard, a piece of broken skull rolled. I was -stepping from one car to the other and a piece of this broken skull rolled off the company car on the ground and hit my foot.
 

 
 *154
 
 “Q. Did you hear any warning? A. Mr. Tindall hollered, ‘Look out, Art,’ but it was too late.
 

 “Q. At that time were you in between the two cars? A. Yes.
 

 “Q. And facing Mr. Tindall? A. Facing Mr. Tindall.
 

 “Q. Up to that time had you had an opportunity to observe the load or the condition of the load on this one Sharon Steel car No. 132? A. I had not, no.
 

 “Q. I presume that you looked at it after the accident happened? A. I did, yes.
 

 “Q. Did the brakeman stop the train there? A. Yes, sir.
 

 “Q. Which foot did this piece of skull or piece of steel hit? A. The left.
 

 “Q. And where on the left foot did it strike? A. The instep.
 

 “Q. You mean the top part of your foot? A. Yes.
 

 ‘ ‘ Q. Could you describe to us the piece of steel that rolled off? A. Well, it was a piece of broken skull, the left-overs taken out of the ladles and taken to the skull cracker and broken in small pieces, so they can be put in the. furnace.
 

 “Q. What was its weight?" Can you estimate it? A. It was estimated between three hundred and fifty and four hundred pounds.
 

 “Q. Tell us something about the Sharon Steel car. What kind of a car was it? A. A little low car, thirty-one feet long with a sideboard running around about eighteen inches high, and had a flat bottom.
 

 “Q. And around the edge of the car is the sideboard? A. Yes, about eighteen inches high.
 

 “Q. Above the body of the car? A. Yes.
 

 “Q. Was this load of scrap or cracked skull piled above that sideboard? A. It was.
 

 “Q. About how much higher? A. Approximately two or two and a half feet.
 

 
 *155
 
 “Q. Above tbe top of the sideboard? A. At the crown of the load.
 

 “Q. Did the load shape up to a peak in the center, and slope toward the side and ends? A. It did.
 

 “Q. In addition to this foot and a half sideboard, were there any screens? Were there any screens or anything else on the sides or ends of the car in addition to the foot and a half sideboard? A. No, there were not.
 

 “Q. There were no wires or ropes or anything else there to hold this load? A. No.”
 

 Dr. H. C. Stahl, a chiropodist; and Dr. Fred McClain, a chiropractor, were called and testified as to the nature and extent of plaintiff’s injuries.
 

 Plaintiff also testified that there was no unsual movement in the switching operation at or before the time of the accident.
 

 Thereupon plaintiff rested his case.
 

 No useful purpose would be served by detailing all of the testimony offered by plaintiff. The record discloses that at that stage of the proceeding the plaintiff had offered substantial evidence in support of the averments of the petition, and therefore the question of defendant’s negligence was one for determination by the jury.
 

 The motion for a directed verdict for defendant was properly overruled.
 

 The defendant offered the testimony of H. H. Sproat, who testified as to the rule of the railroad company set forth in defendant’s answer. Dr. R. G. Mossman examined the plaintiff’s feet the day before the trial and Dr. John Heberding examined x-ray films of plaintiff’s foot, and both testified as to their examinations. Walter Kruse, claim agent for the Pittsburgh & Lake Erie Railroad Company, gave his version of the facts and circumstances surrounding the execution of the release and testified further that W. Carlton Young
 
 *156
 
 reimbursed the railroad company in the amount of $150 paid plaintiff by the check of the railroad company.
 

 W. Carlton Young, attorney for the Zurich General Accident
 
 &
 
 Liability Insurance Company Limited, testified as to his arrangement with Kruse for the latter to represent the defendant in the settlement of plaintiff’s claim.
 

 Garrett A. Connors, vice president of the Sharon Steel Corporation, was called and1 produced the liability insurance policy in force on the date of the accident issued by the insurance company to Sharon Steel Corporation, insuring defendant against liability for injury or death occurring to its workmen in accordance with the provisions of the policy.'
 

 The defendant also offered the plaintiff’s statement made in writing, dated August 9, 1937; the release dated September 13, 1937; the original petition filed by plaintiff; and a letter from the claim agent of the insurance company to W. Carlton Young.
 

 Thereupon defendant rested its case.
 

 The motion for an instructed verdict for defendant was renewed and again overruled.
 

 On rebuttal plaintiff testified as to the facts and circumstances surrounding the execution of the release.
 

 Kruse and plaintiff were the only witnesses who testified upon the subject of the release and their testimony was in sharp and direct conflict. If the jury believed the testimony of Kruse then the release was valid and binding; on the other hand, if the jury believed the testimony of plaintiff then the release was void upon the ground of fraud as to the nature of the instrument.
 

 That the jury believed the plaintiff’s testimony is evidenced by the verdict.
 

 The court committed no error in its rulings on these motions.
 

 Assignments 2 and 3:
 

 
 *157
 
 “2. In submitting to the jury and in charging the jury upon the question of the ‘release’ issue or the contract issue when said questions should have been determined by the court as a matter of law.
 

 “3. That the court erred in submitting to the jury the ‘release’ or contract issue together with the issue of negligence. ’ ’
 

 These two claims of error will be disposed of together.
 

 Section 11379, General Code, provides in part as-follows:
 

 “Issues of law must be tried by the court, unless referred as hereinafter provided. Issues of fact arising in actions for the recovery of money only, or specific; real or personal property, shall be tried by a jury * * # j J
 

 Section 11380, General Code, reads:
 

 “All other issues of fact shall be tried by the court,, subject to its power to order any issue to be tried by a jury, or referred.” See
 
 Carlisle et al., Exrs.,
 
 v.
 
 Foster, Exr.,
 
 10 Ohio St., 198;
 
 George D. Morgan & Co.
 
 v.
 
 Spangler,
 
 20 Ohio St., 38.
 

 The issue as to the release was whether it was void' on the ground of fraud as to the nature of the instrument signed.
 

 Counsel for defendant claim that at best this release-was only
 
 voidable
 
 and therefore the plaintiff had no-legal right to proceed with his action for personal injuries until and unless such release was set aside.
 

 A contract obtained by-fraud may be void or voidable.
 

 19 Ohio Jurisprudence, 332, Section 18, reads in part-as follows:
 

 “Whether á fraudulent transaction is absolutely void and ineffective or merely voidable and effective-until rescinded or set aside depends upon the nature-of the fraud inducing or affecting it. *
 
 *
 
 * On the-
 
 *158
 
 other hand, where there is fraud in the execution, such as * * * misrepresentation of the nature of the instrument signed, the transaction is wholly void and ineffective. ’ ’
 

 The exact question in the instant case was presented and decided in
 
 Perry
 
 v.
 
 M. O’Neil & Co.,
 
 78 Ohio St., 200, 85 N. E., 41.
 

 Paragraph one of the syllabus reads as follows:
 

 “1. A release of a cause of action for damages for personal injuries, that is void, is not a bar to such an action, and the plaintiff, may, if it is set up by answer as a bar to his right of action, by reply aver the facts that make it void; but if it is not void, but only voidable, he cannot maintain his action until the release is set aside.”
 

 The question therefore is whether the averments of the second amended reply is of facts, which, if proven, would show that the release was void.
 

 An examination of such reply reveals substantial averments of fraud and misrepresentation as to the nature of the instrument signed, which, if proven, would make the transaction wholly void and ineffective.
 

 Under that state of the pleadings it was clearly within the discretion of the trial court to submit the issue of fraud to the jury under proper instructions; however the court was not bound by the findings of the jury.
 

 Assignment 4: That the court erred in permitting amendments to the pleadings on behalf of the plaintiff over the objections and demurrers of defendant.
 

 This question is not difficult.
 

 Section 11363, General Code, provides:
 

 “Before or after judgment, in furtherance of justice and on such terms as it deems proper, the court may amend any pleading, process, or proceeding, by adding or striking out the name of any party, or by correcting a mistake in the name of a party or a mistake in .any
 
 *159
 
 other respect, or by inserting other allegations material to the case, or, when the amendment does not substantially change the claim or defense, by conforming the pleading or proceeding to the facts proved. When an action or proceeding fails to conform to the provisions of this title, the court may permit either to be made conformable thereto, by amendment.”
 

 Amendments are a matter within the discretion of the trial court and no judgment will be disturbed unless the record affirmatively discloses a gross abuse of discretion.
 

 Counsel have failed to call to our attention any reason why the defendant was prejudiced by any amendment allowed by the court, and the record fails to disclose affirmatively any gross abuse of judicial discretion. See
 
 Clark
 
 v.
 
 Clark,
 
 20 Ohio St., 128;
 
 Brock
 
 v.
 
 Bateman,
 
 25 Ohio St., 609.
 

 Assignment 5:- That the court erred in the admission of evidence.
 

 No specific error is set forth in the brief of appellant.
 

 In almost any vigorously contested trial some error in the admission of evidence can be found in the records
 

 The surgeon’s supplemental report of personal injury dated August 27, 1937, was incompetent and should not have been admitted in evidence and some-incompetent questions were asked by counsel for both parties and answers thereto were permitted by the-court.
 

 This record makes clear that no prejudice resulted to defendant as the result of error in the admission of evidence.
 

 Assignment 6: That the court erred in overruling defendant’s motion for a final judgment in its favor notwithstanding the verdict.
 

 Section 11601, General Code, reads as follows:
 

 
 *160
 
 “When, upon the statements in the pleadings or upon the evidence received upon the trial, one party is entitled by law to judgment in his favor, judgment shall be so rendered by the court, although a verdict has been found against such party and whether or not motion to direct a verdict may have been made or overruled, but no judgment shall be rendered by the court on the ground that the verdict is against the weight of the evidence.”
 

 This case presented several disputed questions of fact and the defendant, upon the statements in the pleadings or upon the evidence received upon the trial, was not entitled by law to a judgment in its favor.
 

 Assignment 7: That the court erred in its general charge to the jury after argument.
 

 Defendant set forth the following language used by the court and claims it is erroneous and prejudicial:
 

 “In the proof of fraud you take into consideration positive evidence and circumstantial evidence. The reason I say circumstantial evidence is that the parties or persons that attempt to perpetrate a fraud usually do not do their acts in broad daylight, they wait until the dark of the moon. Their acts may not be traced,-— like it is difficult sometimes to trace the acts of criminals. Seldom the criminal will give himself away to such an extent his tracks may be followed, so that measurements of his feet, the kinds of marks of the soles of his shoes may be brought into evidence as circumstances, his weight and height, the color of his hair and eyes; as where the burglar has used a knife to open the window and the knife blade is still sticking in the wood of the building that may be fitted into the knife he has in his pocket if the blade is broken, that being a circumstance. Parties that perpetrate fraud do not usually act in the usual and ordinary and customary way men do in fair dealings. They sometimes put on the rubber gloves of righteousness so that the
 
 *161
 
 minions of hell can do their deeds without any hindrance of finger prints; they sometimes put on the white cloak of innocence to bury the darkest heart that ever beat in human beings; so that juries and jurors in considering the circumstances on the question of fraud must look to the actors, the ones that are attempting to perpetrate or prevail with fraud as against the individual. ’ ’
 

 This portion of the charge standing alone would be improper.
 

 It is a familiar rule that in considering the charge of a court all of the charge upon the particular subject complained of should be considered.
 

 Just before the language complained of the court had this to say:
 

 “Now, what is fraud? I might have said when I read to.you that upon the evidence being adduced by the defendant that the plaintiff signed the release when he said, and it was executed, the defendant had
 
 prima facie
 
 established a defense to plaintiff’s petition. Now, what is meant and what do we mean by
 
 prima facie
 
 defense?
 
 Prima- facie
 
 defense is a legal term often used in courts and by lawyers, is such a defense as will prevail if not rebutted or deposed or disproved, so that on the presentation of this release and signed by the plaintiff the defendant has presented a
 
 prima facie
 
 case or defense; therefore, the plaintiff must come forward on his own affirmative claim it was obtained by fraud and establish by evidence clear and convincing to a jury that that release was obtained by fraud, and as I have said if obtained by fraud it vitiates and voids the contract or release.
 

 “Now, fraud is any deception, trick, cunning or other unfair means used to cheat another. It may be actuated or carried through by cunning, deception or device and the acts and intention of the actors perpetrating the fraud as against the individual who claims
 
 *162
 
 fraud was perpetrated. The essence of a fraudulent transaction is bad faith. The law presumes, however, that all men are fair and honest, that their dealings are in good faith, and without any intention to cheat or defraud. The law abhors fraud. When a transaction, called in question, is susceptible of two constructions, one that it is fair and honest, and one that it is dishonest, the law is, that the fair and honest construction must prevail; and the transaction in question, that is the transaction in this suit must be, as a matter of law, presumed to have been fair. Fraud, therefore, is never presumed, except that the law presumes-that the person intends natural results of his acts; and the burden is upon him who alleges fraud to prove it. Thus, fraud may be proved by circumstances from which the inference of fraud is natural and clear.”
 

 Immediately after the language complained of the court used this language:
 

 “Now, further, a man always must use due diligence to protect himself from the consequences of the fraud, and by due diligence is meant such diligence as the greater majority of ordinary prudent men would use under like or similar circumstances. Take the parties, the plaintiff and the claim agent of the Pittsburgh & Lake Erie Railroad Company when they met and were considering and talking about this release or furt-herment [sic] of this claim or the adjustment of wages, was it free and open? Were they standing at arms length or was there a different relation between them?' Was there a confidence reposed in this claim agent by the plaintiff by reason of his position with the Pittsburgh & Lake Erie Railroad Company at the time and place that the plaintiff might rely upon and trust, yet the plaintiff was required to use due diligence under all the facts and circumstances?
 

 “Now, what are the elements that the plaintiff must prove to establish fraud, or the ingredients that are
 
 *163
 
 actionable he must establish by clear. and convincing •evidence to you? The telling of a bare, naked falsehood is not actionable in and of itself.' One of the ingredients of an actionable fraud is that the falsehood must be asserted with the intention that another shall believe it true and act upon it; and such intention is fraudulent, whether the person asserting the falsehood knew that it was false, or recklessly stated it to be true, not knowing whether it was true or false.”
 

 The court then charged the jury correctly upon the •elements necessary to prove fraud.
 

 When all that was said upon the subject of fraud is •considered we do not think the charge was prejudicial.
 

 Assignment 8: That the verdict is contrary to law.
 

 Under this assignment we shall discuss three questions of law commented upon in the brief of appellant.
 

 First.
 
 That plaintiff was guilty of negligence as a matter of law.
 

 The doctrine of negligence
 
 per se
 
 has application •only to the violation of statutes or ordinances.
 

 29 Ohio Jurisprudence, 427, Section 38, reads in part:
 

 “In Ohio, there is considerable authority in support of the prevailing view that the violation of the terms •of a statute constitutes negligence
 
 per se.
 
 The most popular expression of this rule in Ohio is that the violation of a statute passed for the protection of the public is negligence
 
 per se,
 
 or negligence as a matter •of law.”
 

 There was no claim that plaintiff had violated the provisions of any statute or ordinance and it therefore follows that he could not have been guilty of negligence
 
 .per se
 
 or negligence as a matter of law.
 

 Second.
 
 That plaintiff cannot recover under the doctrine of assumed risk.
 

 29 Ohio Jurisprudence, 536, Section 91, reads in part:
 

 
 *164
 
 “The rule is, that one who exposes himself to an obvious and appreciated danger, even though he should net appreciate the full extent of the danger, assumestbe risk of injury that may result to him therefrom. Under ordinary circumstances, a person fully aware-of a danger, who ignores it, assumes the risk incident, to such danger.”
 

 The doctrine of assumed risk is applicable only where-a party exposes himself to an obvious and appreciated danger. There is no' evidence in this record to make that doctrine applicable. The only evidence upon that, subject is that plaintiff did not see the car until immediately before the accident.
 

 Third.
 
 That the release of one joint tort-feasor is-a release of all.
 

 There is no question of joint tort-feasors in this, case. The plaintiff at no time made any claim for this injury against any person or corporation except defendant.
 

 We are unable to see how it could have been claimed' that the railroad company was guilty of negligence in connection with the injury to plaintiff.
 

 A casual reading of the facts in this case makes it .perfectly obvious that the railroad company had nothing to do with the accident. The only connection of the railroad company was when its claim agent sent for the plaintiff sometime after the accident and represented that the railroad company was paying one-half of his lost wages and thereby secured the release-in favor of defendant which the jury found was void.
 

 - Section 11364, G-eneral Code, provides in part as-follows:
 

 “In every stage of an. action, the court must disregard any error or defect in the pleadings or proceedings which does not afiféct the substantial rights of the-adverse party. . No judgment shall be reversed, or affected, by reason of such error or defect. In the judg
 
 *165
 
 ment of any reviewing court upon any appeal in any civil action, when it is sought to reverse any final judgment or decree or obtain a new trial upon the issues joined in the pleadings, such reviewing court shall / certify on its journal whether or not in its opinion substantial justice has been done the party complaining, as shown by the record of the proceedings and judgment under review. In case such reviewing court shall determine and certify that in its opinion substantial justice has been done to the party complaining as shown by the record, all alleged errors occurring at the trial shall by such reviewing court be deemed not prejudicial to the party complaining and shall be disregarded and such judgment or decree under review shall be affirmed * * * .”
 

 We are of opinion that substantial justice has been done the party complaining; that there is ample evidence to support the verdict of the jury and the judgment of the court; that.no prejudicial error was committed in the trial of the case; and that the judgment of' the Court of Appeals affirming the judgment of the Court of Common Pleas should be .and hereby is affirmed.
 

 Judgment affirmed.
 

 Matthias, Hart, Zimmerman and Turner, JJ., concur.
 

 Weygandt, C. J., dissents.
 

 Williamis, J., not participating.