AUTOMATED SOLUTIONS CORP., Appellee,

v.

PARAGON DATA SYSTEMS, INC., Appellant.

[Cite as *Automated Solutions Corp. v. Paragon Data Sys., Inc.,* 167 Ohio App.3d 685, 2006-Ohio-3492.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 86067.

Decided July 6, 2006.

686

Goodman, Weiss & Miller, L.L.P., Drew A. Carson, David A. Kunselman, and John E. Schiller, for appellee.

Gallagher, Sharp, Fulton & Norman, Timothy J. Fitzgerald, James F. Koehler, and Colleen A. Mountcastle; Brouse McDowell, Joseph T. Dattilo, and Charles D. Price, for appellant.

KARPINSKI, Judge.

{¶ 1} Defendant, Paragon Data Systems, Inc. ("the hardware company"), appeals the trial court's ruling on a declaratory judgment action interpreting its contract with plaintiff, Automated Solutions Corp. ("the software company"). Paragon manufactures computer hardware, and Automated writes software to run on computer hardware.[1]

{¶ 2} The hardware company discussed with the Chicago Tribune a project that would provide the Tribune with a hand-held computerized inventory device for its newspapers. Because the hardware company provided only the physical components, it needed a software developer to write the software for the system. The hardware company, therefore, contacted a software company with which the hardware company had done projects in the past. Both companies entered into a contract to work together on the Tribune's project and share the copyright and profits, including profits from any modified software sold to other periodical publishers ("the building contract"). The software company, in turn, entered into a contract with the Tribune to write the software for it ("the licensing agreement"). Wanting to keep a close eye on the costs of the project, the Tribune requested that all invoices be processed through one entity. The parties agreed that the hardware company would handle the invoices and reimburse the software company.

{¶ 3} Development of the software took longer than expected because the Tribune required numerous changes to the system. At a meeting with the Tribune in 2002, an officer of the software company stated that it was experiencing severe financial difficulties and that if requests for changes continued, it would "have to close its doors in three weeks." This comment caused concern to the Tribune, which contacted the hardware company for reassurance that the project would not fail. The hardware company assured the Tribune that because of the way the hardware company's contract with the software company was written, in the event the software company failed, the hardware company would assume all the software company's rights to the software and also would ensure that the project would be completed.

{¶ 4} Meanwhile, the relationship between the hardware company and the software company deteriorated significantly during 2002, the year the project was to have been completed. The software company discovered that the hardware company had been altering its billings to the Tribune and had not been paying

---

1. The hardware of a computer system is the tangible portion: the monitor, the keyboard, the mouse, the actual computer itself. The software is the set of instructions that the hardware executes. To analogize this to cooking, the stove, pan, etc. are the hardware, and the recipe is the software.

the software company its share of the payments. Specifically, contrary to their agreement to split the profits, the hardware company was underpaying the software company its share of profits from the sale of hardware.

{¶ 5} Because of the delay in completing the software contract and the growing distrust between the companies, the hardware company executed an agreement memorialized in a letter signed by both companies and copied to the Tribune ("the September 2002 letter"). This letter acknowledged various financial transactions that had occurred between the companies and, more importantly, provided that the Tribune would pay the software company's invoices directly, rather than channel payments through to the hardware company, as it had in the past.

{¶ 6} Additionally, the amended agreement required the software company to provide unencrypted source code no later that 120 days from September 20, 2003 (January 18th, 2003) or once the "go-live milestone" has been reached, whichever comes first. In consideration for this unlocked code, [the hardware company] has agreed to pay [the software company] $3,000.00 of its final milestone payments, as part of a compromise. Encrypted code updates will occur approximately twice per month starting no later than the first week of November, 2002.

Letter of September 20, 2002.

{¶ 7} The software company admitted that it was several weeks late in delivering the unencrypted source code, but it claims that it did provide the code as soon as the code was in a form that could be delivered. The hardware company, on the other hand, claimed that because the software company's comments were stripped from the code, it was not usable.[2] The hardware

---

2. {¶ a} Unencrypted source code is a series of computer commands or files that contain the logic of the software (the actual instructions) written in a programming language that computer experts can easily read.

{¶ b} Encrypted source code is the same information scrambled, like a code, to prevent anyone from stealing its contents. All the information is there, but it can be used only by someone with the key. To run the text through an encryption program requires the use of a key and some series of steps that only the program knows to scramble up the text so it appears to be incomprehensible. When recipients receive this mess of text, they use the scrambled text, the key, and the encryption program to unscramble the mess into the text that the person who encrypted it wanted them to see. Clearly, persons encrypting the program want to safeguard their key, since that is what helps keep the scrambled text a secret that only keyholders can unlock.

{¶ c} The software company promised the hardware company unencrypted code, which is exactly what it gave to the hardware company. The hardware company nonetheless claimed that the software company had failed to abide by the agreement because the code it provided did not contain the comments of the software writer. These comments, which the hardware company complained were missing, are placed alongside the code like an in-line, real-time, context-sensitive phrase-translation book. They do not affect the usability of the code; the compiled output (the executable program) would behave the same whether comments were

company took no action, however, against the software company concerning the code at that time.

{¶ 8} On September 9, 2003, nearly one year after the letter was written and six months after the code was due to the hardware company, the hardware company mailed another letter to the software company. In this letter, the hardware company noted that it had "worked with [the software company] to renegotiate the deadlines for [the software company's] performance after it was made clear that the original deadlines would not be met." This letter also complained of the software company's failure to provide either the unencrypted or encrypted software according to the agreement in the September 2002 letter amending the original agreement. The hardware company then set a deadline of September 15, or five days later, for the software company to respond, preferably by providing the software (code) update.

{¶ 9} On September 16, the day after the deadline, the hardware company's counsel terminated the contract in a letter, which stated:

> This letter is to formally notify you that, effective immediately, the [original contract between the hardware company and the software company] and modified by letter agreement dated September 20, 2002 ("letter") is hereby terminated by [the hardware company.]

Letter of September 16, 2003.

{¶ 10} As grounds for terminating the contract, the hardware company cited the software company's "repeated material breaches of the Agreement," including the delays in providing workable software and its refusal to provide the required software updates (codes)to the hardware company. The letter noted that the hardware company did not accept the software company's claim that the hardware company was required to prepay $3,000 in exchange for the software code. Rather, the hardware company "unequivocally demand[ed] that [the software company] immediately transfer all rights in and to the Software to [the hardware company], as mandated by the Agreement and to turn over the source code and all unencryption keys." The software company responded by filing a complaint for a declaratory judgment interpreting the contract. That complaint is the subject of this appeal.

{¶ 11} Two days after sending the termination letter to the software company, the hardware company sent a letter instructing the Tribune to send all payments

---

included in the source file or not. The actual lines of code are the same in either case, so they would produce the same machine language instructions.

{¶ d} The absence of the comments, therefore, might make the code more difficult for someone unfamiliar with software to understand, but their absence would not affect the person's ability to actually use the software. The comments are not a necessary element of unencrypted code. Stripping the code of comments does not render it encrypted.

for the software to the hardware company and not to the software company. The Tribune responded by writing that the licensing agreement was between the Tribune and the software company and that the hardware company was not a party to that contract. It also noted that the Tribune was not a party to the contract between the software company and the hardware company; rather, it was only a third-party beneficiary in that contract. The Tribune added that it did not consider the software company to be in breach of its licensing agreement with it and pointed out that the Tribune could not risk "being in breach of the software licensing agreement" because of the investment the Tribune had in the program. Letter of October 27, 2003.

{¶ 12} After a bench trial, the court issued its judgment, ruling:

By terminating the contract, [the hardware company] lost any rights under the contract as of that date.

 \* \* \*

The parties were joint owners of the software until September 16, 2003. [The hardware company], however, has no legal rights related to any modifications of the software made after [the hardware company]'s unilateral termination of the contract on September 16, 2003. As of that date, all obligations between the parties were "terminated."

Judgment entry of February 4, 2005.

{¶ 13} The parties filed a motion to clarify this order, to which the court responded as follows:

On September 16, 2003 [the hardware company], having freely, voluntarily and unambiguously terminated the contract in writing, was no longer a party to the joint ownership agreement \* \* \*.

Since the termination of the agreement by [the hardware company], the ownership of the code and all modifications made since September 16, 2003 are rightfully owned by [the software company]. [The hardware company] had a one-half joint ownership over the code as it existed until [the hardware company] terminated the contract on September 16, 2003. At that time, [the software company] gained exclusive and complete ownership over the software/code and any modifications.

Journal entry of February 14, 2005.

{¶ 14} The hardware company appealed, stating five assignments of error, the first of which follows:

I. The trial court's judgment in this case must be vacated as it is due to the court's complete lack of subject-matter jurisdiction as to the parties' ownership claims pursuant to the software development and ownership agreement be-

cause those claims are within the exclusive jurisdiction of the federal courts because they have been preempted by Section 301 of the Copyright Act.

{¶ 15} The hardware company raises, for the first time on appeal, its claim that the state court lacked subject-matter jurisdiction over this case because it involves the federal Copyright Act, which subject matter is exclusively under the jurisdiction of the federal courts. The hardware company correctly points out that subject-matter jurisdiction is never waived and may, in fact, be raised even after judgment is issued. *State ex rel. White v. Cuyahoga Metro. Hous. Auth.* (1997), 79 Ohio St.3d 543, 544, 684 N.E.2d 72.

{¶ 16} The parties agreed to limit the subject of the bench trial to the first count of the software company's complaint, which states:

Pursuant to Ohio Revised Code § 2721.03, any person interested under a written contract may have determined any question of construction or validity arising under the instrument and obtain a declaration of rights, status, or other legal relations under it.

* * *

* * * [The software company] asks the Court to enter an order declaring: (1) that [the software company] no longer has any obligations to [the hardware company] under the agreements between the parties; (2) that [the software company] is the sole owner of the [software system which is the subject of the contract]; (3) for an order enjoining the hardware company from claiming an ownership interest in the [software system which is the subject of the contract], enjoining the hardware company from claiming an ownership interest in [the software system which is the subject of the contract], enjoining the hardware company from interfering with the software company's ownership interest in [the software system which is the subject of the contract] and enjoining the hardware company from interfering with the software company's prospective and actual business relationships.

Amended complaint, ¶ 64 and 66. It is this count only that we examine to determine jurisdiction over the cause of action.

{¶ 17} The hardware company is correct in noting that federal law reserves jurisdiction over copyright issues to itself exclusively, under 28 Section 1338, Title 28, U.S.Code:

(a) The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks. Such jurisdiction shall be exclusive of the courts of the states in patent, plant variety protection and copyright cases.

This copyright jurisdiction includes software materials. *Young v. Richmond* (1990), 895 F.2d 967.

{¶ 18} The right to the copyright of the software material that the software company wrote is a major issue. The fact that the subject of the dispute is copyrightable material, however, is not dispositive of the jurisdictional question.

{¶ 19} If the subject matter of the dispute does not invoke federal copyright law, but rather state law, then the jurisdiction of the suit is properly the state's. "The mere fact that the complaint discloses that the case involves a copyright dispute, however, does not in itself lead to a conclusion that the case 'arises under' the Federal Copyright Act for the purposes of jurisdiction under 28 U.S.C. § 1338(a). Many disputes over copyright ownership will arise under state law and involve no federal law questions." Id., 895 F.2d at 969. When the only question before a state court is an interpretation of a contract, the federal court does not have exclusive jurisdiction over the claim. As one federal court noted,

the Copyright Act only limits any rights or remedies under State law with respect to infringement activities. 17 U.S.C. § 301(b)(3). These activities are (1) reproduction, (2) preparation of derivative works, (3) distribution, (4) public performance, and (5) public display of copyrighted works. 17 U.S.C. § 106. ASI does not claim that [defendant] has violated any of these rights, only that he has breached his contract by not relinquishing his rights to the product on the patent application. However, federal jurisdiction does not exist where the claim is essentially for "a naked declaration of ownership or contractual rights * * * even though the claim might incidentally involve a copyright or the Copyright Act." *Topolos v. Caldewey,* 698 F.2d 991, 993 (9th Cir.1983) citing *Royalty Control Corp. v. Sanco, Inc.,* 175 U.S.P.Q. 641, 642 (N.D.Cal.1972).

*Alternative Systems v. Connors* (N.D.Cal. July 27, 1993), 1993 WL 299223, at *4.

{¶ 20} The complaint in the case at bar makes no claims of copyright infringement. Rather, it asks the trial court to determine the true owner of the software it wrote. "[Q]uestions regarding the ownership of a copyright are governed by state law" and are not the subject matter of federal jurisdiction. *Scholastic Entertainment v. Fox Entertainment* (2003), 336 F.3d 982, 983. The trial court, therefore, properly exercised its jurisdiction in this case. Accordingly, this assignment of error is overruled.

{¶ 21} For its second assignment of error, the software company states:

II. The trial court erred in finding that ASC [Automated] had not breached the software development and ownership agreement prior to September 16, 2003 because of the termination of the agreement.

{¶ 22} The hardware company argues that the trial court erred when it held that the software company had not breached the contract.[3] The hardware

---

**3.** The hardware company mistakenly states this holding. The trial court never made such an explicit finding; however, the court affirmatively stated that the delays that were alleged to

company had claimed that the alleged breach occurred when the software company missed the 180–day deadline in the contract and when it failed to provide the code updates bargained for in the September 2002 letter that amended the contract.

{¶ 23} The court's order and opinion states, "It is undisputed that the Chicago Tribune requested modifications to the software, which resulted in delays and continuances. Continuances due to modifications are allowed by the express terms of the June 2001 contract." Opinion and order of February 4, 2005.

{¶ 24} Those "express terms" are found in Section 6 of this contract, which provided that the Tribune had ultimate authority to alter the time lines in the contract:

> [The software company] and [the hardware company] agree that should [the software company] not complete the development of said software within 180 business days from the date of this contract in order, *or to satisfy the terms and conditions of contract with the Chicago Tribune, Inc., based upon the timelines agreed upon by The Chicago Tribune* and [the software and hardware companies] exclusive of documented delays resulting from the actions of third parties outside [the software company's] control then the following events shall occur * * *.

(Emphasis added.)

{¶ 25} The Tribune's control of the deadlines and timelines contained in this contract between the hardware company and the software company also applied to the contract between the software company and the Tribune. That agreement at 2 states:

> In the event of a delay caused by Chicago Tribune or a third party vendor, [the software company] has the option to extend the 150 day software delivery commitment for an amount of time equal to the delay by submitting notice in writing to the Chicago Tribune within 5 business days of notification of the delay.

{¶ 26} The president of the hardware company testified that he had received a letter from the Tribune stating that the "Tribune is not claiming that [the software company] has breached the software licensing agreement [the contract between the software company and the Tribune.]" October 27, 2003 fax from George Barr to Giles Manias at the hardware company. Additionally, Gerri Boyle, the Tribune's representative, testified in a deposition, which was admitted at trial, that the Tribune did not consider the software company to be in breach

---

have breached the contract, in fact, were "allowed by the express terms of the June 2001 contract."

of its contract with the Tribune. Deposition of Gerri Boyle at 31. When asked whether the changes the Tribune requested were documented as per the contract, Boyle testified that she did not remember exactly what forms were used. She testified: "I don't remember what the change order plans were in the contract. We did have change order control." Id. at 198. She confirmed that the change orders were not oral and agreed that the Tribune was responsible for the changes. Id. at 197 and 199. Most importantly, she testified that the software company successfully completed the requested changes "within the time period requested by the Tribune." Id. at 198. The Tribune, therefore, did not invoke the exception under Section 6, which would have been triggered if the software company had not satisfied the timelines. Further, the parties all agree that the software was up and running at the Tribune by November 17, 2003. Any delay in completion of the software, therefore, did not cause problems for the Tribune, its intended recipient.

{¶ 27} Although the hardware company pointed to the above-discussed "missed" deadlines in the contract between itself and the software company, the hardware company has presented no evidence to support its assertion that the software company failed to fulfill the contract by the deadline as the Tribune altered it or that it failed to provide the hardware company with copies of the code whenever it could.

■ {¶ 28} Further, by failing to complain of or exercise its rights under the contract at the time these deadlines were allegedly breached, the hardware company waived any rights to enforce those deadlines.

> It is well-settled [sic] that a party, by words or conduct, may waive the terms of a written contract. *White Co. v. Canton Transportation Co.* (1936), 131 Ohio St. 190, 5 O.O. 548, 2 N.E.2d 501; *Cornett v. Fryman* (Jan. 27, 1992), Warren App. No. CA91–04–031, unreported, 1992 WL 12611; *Pekarek v. Broadway Realty Partnership* (May 30, 1991), Cuyahoga App. No. 58626, unreported, 1991 WL 95073. "Waiver," as applied to contracts, is a voluntary relinquishment of known rights. *White Co.,* supra. A party asserting a waiver must prove a clear, unequivocal, decisive act by the party against whom the waiver is alleged. *White Co.,* supra; *Cornett,* supra.

*Cincinnati Gas & Elec. v. Land* (March 16, 1992), Butler App. No. CA91–06–111, 1992 WL 50027. The September 5, 2002 letter amending the agreement is a clear and unequivocal acceptance that the 180–day deadline has passed and that the parties changed the terms of the agreement, changes that were "agreed to in good faith to complete the [Tribune software and hardware] project." Letter of September 5, 2002. This letter clearly functioned as a waiver.

{¶ 29} Further, by failing to enforce its rights under the contract,

[s]uch conduct would amount to an estoppel on the parties so acting. The subsequent acts of parties may also modify the terms of a contract between them. A continued, different, "course of performance" between parties manifests a modification of the original agreement. Calamari & Perillo, Contracts (2 Ed.1970) 130, Section 3–15. It makes no difference what name is applied to that theory whether it be waiver, estoppel, novation or what have you; the theory simply is that the parties showed that they did not intend a particular provision of the contract to be strictly observed.

(Citations omitted.) *Schmidt v. Texas Meridian Resources* (Dec. 30, 1994), Washington App. No. 94CA12, 1994 WL 728059. The original contract, signed June 21, 2001, called for completion of the software within 180 business days of signing, or approximately nine months. The amendment letter was signed approximately six months after that deadline. Enforcement of the termination clause for failure to meet the deadline was long since waived.

{¶ 30} The contract between the Tribune and the software company specifies that a waiver of any breach of the agreement shall not "be deemed a waiver of any subsequent breach." The agreement between the hardware and software companies, however, contains no such provision. On the contrary, the hardware company admitted in a letter to the software company that it had "worked with [the software company] to renegotiate the deadlines for [the software company's] performance after it was made clear that the original deadlines would not be met." Letter from Giles Manies, representative of the hardware company, to Richard Petcher, CEO of the software company, September 9, 2003. This statement implies that the deadlines were flexible. This admission on the part of the hardware company that it worked to renegotiate the deadline portion of the contract is further evidence defeating the hardware company's claim of breach of contract for this cause.

{¶ 31} The trial court did not err, therefore, in implicitly finding that the software company had not breached the contract with the hardware company. Accordingly, this assignment of error is overruled.

{¶ 32} For its third assignment of error, the hardware company states:

III. The trial court erred when, despite ASC's breach, it declared that paragon has no legal rights to the subject software/code after September 16, 2003 because of the termination of that agreement.

{¶ 33} The hardware company argues that the trial court erred in stripping it of any rights to software modifications made after the hardware company terminated the contract. In its brief, however, the hardware company merely continues to argue the software company's alleged breaches and to demand as its sole remedy that the software company "immediately transfer all its rights in and to the software to [the hardware company] as mandated by the Agreement and to

turn over the source code and all unencryption keys." The hardware company's announcement that it was terminating its contract had consequences well established under contract law. Appellant's brief at 17. Because the trial court did not find that the software company had breached the agreement, however, this remedy is inapplicable. It is clear that the hardware company does not have a right to exclusive ownership and use of the code.

{¶ 34} Nonetheless, the hardware company, despite its unwarranted termination of the contract, should not be expected to have subsidized the costs of development of the software without repayment. A review of the record, however, shows that repayment occurred: an officer of the hardware manufacturer testified that it had billed the Tribune for the money it had advanced to the software company for development of the software and had received payment. The hardware company was repaid, therefore, for its out-of-pocket expenses in the project. As for any loss of the time invested in the project, the hardware company made the decision to unilaterally terminate the contract and, therefore, should sustain the resulting loss of productive use of its time. The software company was not financially subsidized by the hardware company, and there is no financial debt owed by the software company to the hardware company.

{¶ 35} The repudiation of a contract " 'did more than excuse the plaintiff from completing a tender; it authorized him to treat the contract as rescinded and at an end.' " It is clear that " 'as far as the right to rescind goes, notice that a party will not perform his contract has the same effect as a breach.' It is well settled that in order to give rise to an action for damages on a contract, an anticipatory repudiation must be positive and unequivocal, and statements to this effect are likely to be regarded as applicable where the suit is for rescission and restitution, but it has been shown that repudiation need not be absolute in order to justify non-performance by the other party, and in some cases at least it must be true that the privilege of non-performance will be or become permanent." 5 Williston on Contracts (1937) 4102, Section 1467.

{¶ 36} The software company asked for the following relief in its complaint: "the Court to enter an order declaring (1) that [the software company] no longer has any obligations to [the hardware company]; (2) that [the software company] is the sole owner of [the software]; and (3) for an order enjoining [the hardware company] from claiming an ownership interest in [the software], enjoining [the hardware company] from interfering with [the software company's] ownership interest in [the software] and enjoining [the hardware company] from interfering with [the software company's] prospective and actual business relationships." Amended Complaint ¶ 66.

{¶ 37} Although this is a declaratory judgment action, the trial court was correct in providing relief to the software company. As this court has noted,

"[w]hile there is no express statutory provision for the granting of a money judgment in a declaratory judgment action, such relief may be granted so long as it is prayed for and warranted by the proof." *Jeppe v. Blue Cross of Northeast Ohio* (1980), 67 Ohio App.2d 87, 92, 21 O.O.3d 406, 425 N.E.2d 947. Although the software company did not request a money judgment, it did request relief, which the trial court properly granted.

{¶ 38} As to any ownership interest in the software as it was improved or changed after the termination of the contract, we note that the hardware company does not come to the table with clean hands; its representative admitted at trial that it had altered invoices to the software company's detriment. Further, it was the hardware company that breached the contract by unjustifiably exercising the termination clause. When a contract is terminated for default and the contractor is not in default, such a termination is a breach of contract. *Schlesinger v. United States* (1968), 390 F.2d 702. See, also, *Burger King Corp. v. Austin* (1992), 805 F.Supp. 1007, 1015–1016.[4]

{¶ 39} In his treatise, Corbin discusses termination clauses:

*Conditions precedent to exercise the option.* The provision in a contract that creates an option to terminate usually makes its exercise subject to the occurrence of some specified event. The power is a "conditional power," the specified event being a condition precedent to its exercise. It may not do harm to say that no "power" exists until the event occurs; but the power is created by the contract, not by the "event." An attempt to exercise the power prior to the event would be either wholly inoperative or wrongful.

\* \* \*

The contract may provide that the occurrence of a specified event shall operate automatically as a termination of the contract. It is more likely that the provision will be interpreted as creating in one party an option to terminate by giving notice on condition of the event. A contract for the sale of land provided that in case of the purchaser's failure to make payment by a certain date the vendor "may recall all papers and the deal is thereby abandoned and the $ 2,000 forfeited." This created in the vendor a conditional power of termination. [*Stockmen's Supply Co. v. Jenne* (1951), 72 Idaho 57, 237 P.2d 613.] Failure to pay on time did not in itself terminate; it created an option to terminate. \* \* \*

---

4. In *Burger King Corp.*, the court explained: "Similarly, the second allegation of Counts VI and VII states that BKC had an implied obligation 'to not wrongfully terminate' the Franchises. Section 16 of the Franchise Agreement addresses 'Default and Effect of Termination' in explicit terms. Any breach of such Clause by BKC would be an express breach of contract, as was alleged in Counts I and II of the Amended Counterclaim, rather than a breach of BKC's implied obligations." 805 F.Supp. at 1015–1016.

(Footnotes omitted.) 3 Corbin on Contracts (Rev.Ed.Perrillo Ed. 1996) 540–543, Section 11.9.

{¶ 40} In the contract in the case at bar, the termination clause was triggered only by a certain condition precedent, the failure of the software company to meet deadlines as stated in its contract with the hardware company. As previously noted, the contract's deadlines were "with in [sic] 180 business days from the date of this contract in order, or to satisfy the terms and conditions of contract with The Chicago Tribune, Inc." The evidence clearly demonstrates that the software company produced the software in time to the satisfaction of the Tribune. See Deposition of Gerri Boyle.

{¶ 41} In its termination letter, the hardware company states as its reasons for terminating the contract the software company's "repeated material breaches of the Agreement as evidenced by its unworkable delays in performing its obligations thereunder; specifically, to develop the [software] in accordance to the timeline set forth in the Agreement and according to the specifications set forth in the [software company's contract with the Tribune] and the software company's most recent refusals to provide upgrades to the Software as mandated in the Letter." Termination letter of September 16, 2003. Because the software company was not in breach of its contract with the Tribune, and because the software company had completed the contract as required by the Tribune, the only material breach it could have committed would be its alleged failure to provide the hardware company with updated software. This agreement to provide updated software was not, however, subject to the termination clause of the original contract,[5] nor was it incorporated by reference in the subsequent letter agreement that modified the original contract between the hardware company and the software company.

{¶ 42} The condition precedent necessary to trigger the option to exercise the termination clause, therefore, did not exist, and the hardware company's erroneous attempt to exercise the clause was a breach of the contract.

{¶ 43} The trial court did not err in its ruling that the hardware company had forfeited its rights under the contract by terminating it on September 16, 2003. Accordingly, this assignment of error is overruled.

{¶ 44} For its fourth assignment of error, the hardware company states:

IV. The trial court erred in its legal interpretation and construction of the parties' software development and ownership agreement and, as a result,

---

5. Only failure to complete the software within 180 days or according to the Tribune's schedule was subject to the termination clause.

erroneously declared the rights and obligations of ASC and Paragon in regard to the subject software/code.

{¶ 45} The hardware company argues that the trial court did not have the option of awarding the entire software package to the software company because that option was not listed in the contract. The hardware company correctly notes that the contract does not provide for the event of a breach of the contract by the hardware company. Rather, the contract specifically addresses only a breach on the part of the software company, which would be triggered by a failure to meet the deadlines. The contract stated that in the event of a breach by the software company,

[the hardware company] shall become the sole and exclusive owner of the [software which is the subject of this suit], the source codes and all rights to said software and all revenues from all sources generated by said software shall become the sole and exclusive property of [the hardware company] should [the software company] or its principals not complete the terms of this contract;

[the software company] shall take all steps necessary to transfer ownership of the [software which is the subject of this suit] to [the hardware company]; and

the principals of [the software company, president and vice-president,] shall perform independent consulting services for [the hardware company] at the hourly rate of $85.00 until the software is completed and operational in accordance with the terms and conditions of the contract with The Chicago Tribune, Inc. Payment to [the president and vice-president of the software company] for said services shall not exceed the balance of the $200,000 less payments made * * *.

Contract between the software company and the hardware company, section 6.

{¶ 46} If the events had unfolded according to the hardware company's version of the facts, then its assertions would be true. However, when it announced it would no longer perform under the contract, the hardware company, rather than the software company, was the party that breached the contract. Therefore, it was the software company that had the option of deciding whether to enforce the contract. As the Second District Court of Appeals noted in *Wilson v. Kreusch* (1996), 111 Ohio App.3d 47, 56, 675 N.E.2d 571, the nonbreaching party "may either treat the contract as terminated and rescind it and pursue the remedy that such rescission entitles him to, or he may sue for damages for a breach of the contract."

{¶ 47} When it analyzed the question, the trial court granted the software company's request for a ruling that the contract had been essentially rescinded.

If the contract was rescinded, the terms of the contract were no longer enforceable. Moreover, the hardware company had been reimbursed for all the money it had advanced to the software company. This left the court with the option of ruling that all the software company's product belonged to the software company to the exclusion of the hardware company, as the software company had requested in its complaint. *Jeppe,* supra, 67 Ohio App.2d at 92, 21 O.O.3d 406, 425 N.E.2d 947.

{¶ 48} The trial court did not err therefore in ruling that the software was the property of the software company. Accordingly, this assignment of error is overruled.

{¶ 49} For its fifth assignment of error, the hardware company states:

 V. The trial court's orders and opinion are against the weight of the evidence presented at trial.[6]

{¶ 50} The hardware company argues that the weight of the evidence shows the software company breached the agreement when it failed to provide unencrypted code by January 18, 2003, failed to deliver an installed and working copy of the software within the agreed timeline, and failed to provide upgrades.

{¶ 51} Specifically, the hardware company argued that the code it received was not readable because it was stripped of comments. The hardware company never presented any expert testimony, however, to refute the software company's claim that stripped code and encrypted code are totally different statuses of code and not related.

{¶ 52} Furthermore, as more fully discussed in earlier assignments, the evidence at trial showed that the software company provided updated, unencrypted software to the hardware company whenever it could, that it did not breach the contract by missing the deadlines as they were determined by the Tribune, and that the hardware company breached the contract when it wrongfully terminated it. The manifest weight of the evidence supports the ruling the trial court made.

{¶ 53} The trial court's ruling was not against the manifest weight of the evidence. Accordingly, this assignment of error is overruled.

{¶ 54} For its fifth assignment of error, the hardware company states:

 VI. The trial court erred in denying leave of court for the filing of Paragon's counterclaim against ASC.[7]

---

6. Appellant's brief erroneously labeled this assignment as IV.

7. Appellant's brief also mislabeled this assignment as V.

{¶ 55} The hardware company argues that the trial court erred in refusing to allow it to file a counterclaim against the software company.

 {¶ 56} The software company filed its amended complaint on October 17, 2003. The hardware company filed an answer within rule. Nearly a month later, without leave of court, the hardware company filed an amended answer and counterclaim. The software company responded with a motion to strike the amended answer and counterclaim, which the hardware company opposed by memorandum.

{¶ 57} In early March 2004, the trial court ruled that the hardware company could file a counterclaim against the software company, but it struck the counterclaims against the officers of the company. It gave the hardware company two weeks, until March 15, to file its counterclaim. The hardware company filed its counterclaim with a motion for leave to file it instanter on April 27, more than a month late, and appended an affidavit from counsel stating that "missing the deadline was inadvertent and due to a clerical error at the clerk of court's office." Appellant's brief at 25. The trial court denied this motion and struck the counterclaim.

{¶ 58} The hardware company argues that the trial court erred by striking the counterclaim, because Civ.R. 15(A) encourages the court to grant motions to amend pleadings liberally. It also argues that the software company would not have been prejudiced by the timing of the filing of the counterclaim because it had known since the hardware company first attempted to file it that the counterclaim existed, that it did not file the counterclaim for the purposes of delay or in bad faith, and that its delay resulted from excusable neglect because it did not receive the clerk's card with the court's ruling granting it until March 15 to file its counterclaim.

{¶ 59} The docket entry for this court order includes the language "NOTICE ISSUED." This court has held that, when this notation appears on the docket, service is deemed to have occurred:

Once the clerk has served the parties notice of the entry and made the appropriate notation in the appearance docket, notice is deemed served, and the time for filing the notice of appeal begins to run. *Atkinson v. Grumman Ohio Corp.* (1988), 37 Ohio St.3d 80, 523 N.E.2d 851. In cases where the civil rules on service are followed, there is a rebuttable presumption of proper service. *Wainey v. Hollymatic Corp.* (April 27, 1995), Cuyahoga App. No. 66998, 1995 WL 248523, citing, *Grant v. Ivy* (1980), 69 Ohio App.2d 40, 23 O.O.3d 34, 429 N.E.2d 1188. A party's failure to receive such notice after it has been served is neither a basis to challenge the validity of the judgment nor a

defense for failure to file a timely appeal. *DeFini v. City of Broadview Heights* (1991), 76 Ohio App.3d 209, 213, 601 N.E.2d 199.

*Ormond v. Solon,* Cuyahoga App. No. 82553, 2003-Ohio-5654, 2003 WL 22413642, ¶ 7.

{¶ 60} It is well settled, moreover, that parties have the responsibility to keep themselves apprised of the court's entries on the docket, and failure of the clerk of courts to notify them of an order or entry does not excuse compliance with that entry or order. *State Farm Mut. Auto. Ins. Co. v. Peller* (1989), 63 Ohio App.3d 357, 360–361, 578 N.E.2d 874.

{¶ 61} It has long been held that decisions granting or denying late filings of counterclaims are reviewed under an abuse-of-discretion standard: "such discretion will not be disturbed in the absence of 'gross abuse' by the trial court." *Spisak v. McDole* (1984), 15 Ohio St.3d 62, 63, 15 OBR 157, 472 N.E.2d 347, citing *Flynn v. Sharon Steel Corp.* (1943), 142 Ohio St. 145, 159, 26 O.O. 343, 50 N.E.2d 319. In the case at bar, the trial court, after striking a counterclaim filed out of rule, generously granted the hardware company leave to file its counterclaim within a two-week period. The counterclaim was not filed, however, until over a month after the deadline the court had set.

{¶ 62} In its argument before this court, the hardware company never specifies any prejudice resulting from the trial court's refusal to accept its out-of-rule counterclaim. It cites no issues it would have raised in the counterclaim that were not considered and resolved by the trial court in its ruling. Even if, arguendo, the trial court had abused its discretion in denying the counterclaim, because the hardware company failed to show any prejudice resulting from denial, this court will not waste judicial resources by reversing harmless error. This assignment of error is, therefore, overruled.

## CROSS–ASSIGNMENT OF ERROR

{¶ 63} In its response brief, the software company states a cross-assignment of error. It does not designate its response as a cross-appeal, nor did it file a notice of cross-appeal with the court. App.R. 3(C) mandates that "[a] person who intends to defend a judgment or order against an appeal taken by an appellant and who also *seeks to change the judgment or order * * ** shall file a notice of cross-appeal within the time allowed by App.R. 4." (Emphasis added.) The software company's attempted assignment of error seeks to change the trial court's ruling concerning money allegedly owed it by the hardware company. In order to perfect this issue for appeal, the software company had to file a notice of

appeal, which it failed to file. Because this attempted cross-appeal is not properly before this court, we will not address it.

Judgment affirmed.

COONEY, P.J., and GALLAGHER, J., concur in judgment only.

COLLEEN CONWAY COONEY, Presiding Judge, concurring in judgment only.

{¶ 64} I concur in judgment only and write separately to address several areas of disagreement.

{¶ 65} I disagree with the lead opinion's characterization of the September 2002 letter as amending the agreement. Section Eight of the agreement states that the only way to modify the agreement is in a writing "endorsed on this agreement." The September 2002 letter contains absolutely no reference to the agreement, nor does it attempt to change specific terms found in the agreement. Therefore, I dispute the majority's theory that "this letter clearly functioned as a waiver" of the deadlines.

{¶ 66} However, I am inclined to concur in the judgment to affirm because the only condition precedent to exercising the option to terminate the agreement was set forth in Section Six: ASC was required to satisfy the terms of its contract with the Chicago Tribune based on the timelines agreed upon with the Tribune. Because it appears that the Tribune was satisfied, I agree that Paragon had no right to terminate the agreement. Therefore, I agree to affirm the trial court's decision.