[Cite as *USPG Portfolio Six, L.L.C. v. Dick's Sporting Goods, Inc.*, 2023-Ohio-550.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| USPG PORTFOLIO SIX, LLC | : | |
| Appellee | : | C.A. No. 2022-CA-42 |
| v. | : | Trial Court Case No. 19CV0392 |
| DICK'S SPORTING GOODS, INC. | : | (Civil Appeal from Common Pleas Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on February 24, 2023

. . . . . . . . . . .

GREGORY R. FLAX and RANDALL M. COMER, Attorneys for Appellee

THOMAS M. WHELAN, pro hac vice, Attorney for Appellee

JOHN W. MONROE and WILLIAM A. PESESKI, Attorneys for Appellant

GREGORY D. CALL, pro hac vice, Attorney for Appellant

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Defendant-Appellant, Dick's Sporting Goods, Inc. ("DSG"), appeals from a summary judgment rendered in favor of Plaintiff-Appellee, USPG Portfolio Six, LLC

("Portfolio"). According to DSG, the trial court erred in granting summary judgment for several reasons. First, the court erred in rejecting equitable estoppel because factual issues on that subject existed. Second, DSG contends that the trial court erred in failing to consider DSG's affirmative defense of waiver, again because factual issues existed. Finally, DSG argues that the trial court's interpretation of the parties' lease contradicted the lease's language and deprived DSG of its right to pay substitute rent until a co-tenancy violation ended.

{¶ 2} After reviewing the record, we conclude that genuine issues of material fact existed regarding the estoppel and waiver issues. The remaining arguments were not raised in the trial court and cannot be considered other than for plain error. However, there is no reason to consider these issues for plain error because the case is being reversed and remanded to the trial court. On remand, the court will have an opportunity to consider whatever the parties assert. Accordingly, the judgment of the trial court will be reversed, and this matter will be remanded to the trial court for further proceedings.

I. Facts and Course of Proceedings

{¶ 3} This action arose from a lease agreement between the parties. On August 14, 2019, Portfolio filed a complaint against DSG alleging that DSG had breached a lease agreement the parties entered into in October 2015. Under the lease, DSG rented 40,000 of square footage in a retail shopping center known as Bechtle Crossing ("the Center").

{¶ 4} The dispute centered around whether DSG gave timely notice of its election

to terminate the lease, which was to run for 10 years.   According to the lease, DSG had certain rights, including paying reduced rent or terminating the lease if the number of gross square feet of leasable floor area ("LFA") in the Center occupied by qualified tenants dropped below 65% (the LFA "co-tenancy requirement").   On March 18, 2019, DSG gave notice of its election to terminate the lease based on a violation of this requirement.

{¶ 5} In the complaint, Portfolio alleged that DSG had not given timely notice within 60 days after the co-tenancy violation period ended, as the lease required.   Alternatively, Portfolio claimed that the violation had not lasted for the specified time that would permit DSG terminate the lease.

{¶ 6} On September 29, 2019, DSG filed an answer to the complaint and a counterclaim.   DSG also asserted various affirmative defenses.   In the counterclaim, DSG essentially alleged that Portfolio had misled it as to the date that the violation occurred and about when a new tenant was opening operations in order to escape application of the termination provision.   DSG also claimed that it had relied on Portfolio's representations.   Further, DSG asserted that the new tenant was not a "required tenant."

{¶ 7} Subsequently, on November 8, 2019, DSG filed a first amended answer and counterclaim, and Portfolio filed a reply to the counterclaim on November 21, 2019.   On August 20, 2020, the trial court set the case for a jury trial to begin on November 8, 2021.

{¶ 8} On March 19, 2021, Portfolio filed a motion for partial summary judgment. DSG responded to the motion on April 26, 2021.   The trial court filed a decision on July 14, 2021, granting partial summary judgment to Portfolio.   After the court set a damages hearing, the parties stipulated to damages and attorney fees.   Based on the stipulation,

the court filed a judgment entry on May 16, 2022, awarding Portfolio $2,219,711.42 in damages through May 30, 2022, and $145,000 in attorney fees the through entry of final judgment. This timely appeal followed.

## II. Equitable Estoppel

**{¶ 9}** DSG's first assignment of error states that:

The Trial Court Erred in Granting Summary Judgment on DSG's Affirmative Defense that Landlord Is Estopped from Asserting an Earlier Date When the LFA Co-Tenancy Violation Began Because Fact Issues Exist.

**{¶ 10}** Under this assignment of error, DSG contends that the trial court erred in granting summary judgment on its affirmative defense of equitable estoppel, because there were factual issues regarding this issue. Specifically, DSG argues that Portfolio had engaged in various representations that satisfied the elements of equitable estoppel. These acts included: accepting rent payments based on DSG's interpretation of the date of the LFA co-tenancy violation; raising belated objections to DSG's assertion that a violation had occurred without disputing the closure date of the store causing the violation; representing that the violation would be cured on January 29, 2019; objecting to DSG's termination notice without objecting to its timeliness; and waiting until after DSG had vacated the premises and litigation had been commenced before raising a challenge to when the store in question had closed. The store that closed was Bed Bath and Beyond ("BB&B"). Before we address these issues, we will outline the pertinent summary

judgment standards.

## A. Summary Judgment Standards

{¶ 11} We review summary judgments de novo, "which means that we apply the same standards as the trial court." *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 2007-Ohio-2722, 873 N.E.2d 345, ¶ 16 (2d Dist.). "In de novo review, we independently review a trial court's decision and accord it no deference." *Clark v. Beyoglides*, 2021-Ohio-4588, 182 N.E.3d 1212, ¶ 19 (2d Dist.), citing *Northeast Ohio Apt. Assn. v. Cuyahoga Cty. Bd. of Commrs.*, 121 Ohio App.3d 188, 192, 699 N.E.2d 534 (8th Dist.1997).

{¶ 12} "Summary judgment is appropriate if (1) no genuine issue of any material fact remains, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and construing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made." *State ex rel. Duncan v. Mentor City Council*, 105 Ohio St.3d 372, 2005-Ohio-2163, 826 N.E.2d 832, ¶ 9, citing *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977). " 'As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' " *Turner v. Turner*, 67 Ohio St.3d 337, 340, 617 N.E.2d 1123 (1993), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## B. Discussion

{¶ 13} In its answer and amended answer, DSG asserted affirmative defenses, including waiver and estoppel. The party who asserts such affirmative defenses has the burden of proof. *See* Civ.R. 8(C); *Franklin Twp. v. Meadows*, 130 Ohio App.3d 704, 711, 720 N.E.2d 1011 (9th Dist.1998); and *Gevedon v. Hotopp*, 2d Dist. Montgomery No. 20673, 2005-Ohio-4597, ¶ 31.

{¶ 14} The trial court accepted Portfolio's timeline (as to BB&B's closing date) and rejected wavier and estoppel because the lease contained anti-waiver provisions and did not contractually obligate Portfolio to speak. Partial Summary Judgment (July 14, 2021), p. 3. The court commented that it did not find DSG's waiver argument "persuasive." *Id*. While the court agreed that some of Portfolio's acts "were not entirely inconsistent with its position that DSG's notice was untimely," the court found that DSG had failed to show " 'a clear, unequivocal, decisive act of the party against whom wavier is asserted (USPG), showing such a purpose or acts amount to an estoppel on [its] part.' " *Id.,* quoting *White Co. v. Canton Transp. Co.*, 131 Ohio St. 190, 2 N.E.2d 501 (1936) (which required a party asserting voluntary waiver of a known contractual right to prove it by "the greater weight of the evidence").

{¶ 15} As a preliminary point, the case was before the court on summary judgment, not a trial. Furthermore, there is a difference between "waiver" and equitable estoppel (although both were asserted in this case). The court applied a waiver standard and did not apply the correct standards for evaluating equitable estoppel.

{¶ 16} "To establish waiver, the party seeking waiver must demonstrate (1) that the party knew of its right to assert an argument or defense and (2) that the totality of the circumstances establish that the party acted inconsistently with that right." *Gembarski v. PartsSource, Inc.*, 157 Ohio St.3d 255, 2019-Ohio-3231, 134 N.E.3d 1175, ¶ 25. "An assertion that a party waived an argument presents a mixed question of law and fact." *Id.* at ¶ 26.

{¶ 17} "Although waiver is typical of estoppel, estoppel is a separate and distinct doctrine. With estoppel, it is not necessary to intend to relinquish a right." *Chubb v. Ohio Bur. of Workers' Comp.*, 81 Ohio St.3d 275, 279, 690 N.E.2d 1267 (1998). "The purpose of equitable estoppel is to prevent actual or constructive fraud and to promote the ends of justice." *Ohio State Bd. of Pharmacy v. Frantz*, 51 Ohio St.3d 143, 145, 555 N.E.2d 630 (1990). "Equitable estoppel precludes recovery when 'one party induces another to believe certain facts exist and the other party changes his position in reasonable reliance on those facts to his detriment.' " *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 112 Ohio St.3d 470, 2006-Ohio-6553, 861 N.E.2d 109, ¶ 52, quoting *State ex rel. Chavis v. Sycamore City School Dist. Bd. of Edn.*, 71 Ohio St.3d 26, 34, 641 N.E.2d 188 (1994).

{¶ 18} " 'A prima facie case for equitable estoppel requires a plaintiff to prove four elements: (1) that the defendant made a factual misrepresentation; (2) that it is misleading; (3) [that it induced] actual reliance which is reasonable and in good faith; and (4) [that the reliance caused] detriment to the relying party.' " *Hutchinson v. Wenzke*, 131 Ohio App.3d 613, 616, 723 N.E.2d 176 (2d Dist.1999), quoting *Doe v. Blue*

*Cross/Blue Shield of Ohio*, 79 Ohio App.3d 369, 379, 607 N.E.2d 492 (10th Dist.1992). "In assessing these four elements in the context of a particular case, relevant factors include: (a) the nature of the representation; (b) whether the representation was in fact misleading; (c) the relative knowledge and experience of the parties; (d) whether the representation was made with the intent that it be relied upon; and (e) the reasonableness and good faith of the reliance, given all the facts and circumstances." *First Fed. Sav. & Loan Assn. of Toledo v. Perry's Landing, Inc.*, 11 Ohio App.3d 135, 145-46, 463 N.E.2d 636 (6th Dist.1983). *Accord Reid v. Wallaby's Inc.*, 2d Dist. Greene No. 2011-CA-36, 2012-Ohio-1437, ¶ 53.

{¶ 19} "Generally, actual or constructive fraud is required." *Glidden* at ¶ 52, citing *State ex rel. Richard v. Bd. of Trustees of Police & Firemen's Disability & Pension Fund*, 69 Ohio St.3d 409, 414, 632 N.E.2d 1292 (1994). "Actual fraud is the foundation of the action of deceit, is the ordinary legal sense of fraud, and, when applied to contracts, conveys the idea that the assent of one party has been procured by some trick or device. To constitute actual fraud it is necessary that the wrongdoer has an intent to do wrong, and does injury or damage in carrying such intent into execution." *Hanes v. Giambrone*, 14 Ohio App.3d 400, 406, 471 N.E.2d 801 (2d Dist.1984), citing *Kuehner v. Johnson*, 33 Ohio Law Abs. 401, 34 N.E.2d 996 (2d Dist.1940).

{¶ 20} "Constructive fraud is defined as 'a breach of a legal or equitable duty, which, irrespective of moral guilt of the fraud feasor, the law declares fraudulent, because of its tendency to deceive others, to violate public or private confidence, or to injure public interests.' " *Cohen v. Estate of Cohen*, 23 Ohio St.3d 90, 91, 491 N.E.2d 698 (1986),

quoting *Stanley v. Sewell Coal Co.*, 169 W.Va. 72, 76, 285 S.E.2d 679 (1981). In the case before us, there was sufficient evidence of both actual and constructive fraud to establish genuine issues of material fact concerning these issues.

**{¶ 21}** The facts pertinent to assessment of the equitable estoppel argument are as follows. On October 26, 2015, Portfolio and DSG entered into a lease under which DSG agreed to lease a one-story building in the Center for 10 years. The building contained 40,000 square feet of leasable floor area ("LFA"). *See* Section 1.1, p. 1 of the Lease With USPG Portfolio Six, LLC ("Lease"), attached as Appendix I to Portfolio's Motion for Partial Summary Judgment. Section 1.2(d) of the Lease defined "LFA" as "the number of gross square feet of leasable floor area (whether occupied or unoccupied) of the Shopping Center Buildings intended for the exclusive use by any tenant, subtenant, assignee, licensee, concessionaire, or other occupant of this Shopping Center * * * if used for retail sales * * *." *Id.* at p. 2.

**{¶ 22}** The lease contained an initial co-tenancy requirement, which mandated that on the rental commencement date, certain "**Inducement Tenants**" (Kohls and either Marshalls or BB&B) would be fully staffed, stocked, and open, and that at least 65% of the remaining LFA of the Center, with certain exceptions, would be fully staffed, stocked, and open for retail operations by "**Required Tenants**." (Bolding sic.) *Id.* at p. 7, Section 1.6(a) of the Lease.

**{¶ 23}** This section of the Lease defined "Required Tenants" as follows:

A **Required Tenant** shall mean a: (i) national Occupant operating a minimum of thirty (30) high quality retail stores of the types typically found

in first-class regional shopping centers; or (ii) regional Occupant operating at least ten (10) retail stores in the greater Springfield, Ohio region of the types typically found in first-class regional shopping centers, provided that such regional Occupants may not count towards more than fifty percent (50%) of the sixty-five percent (65%) requirement set forth above or in Section 1.7(a) below (thus leaving fifty percent (50%) of the Required Tenants as national Occupants).

(Emphasis sic.)   App. I, Lease at p. 7, Section 1.6(a).

**{¶ 24}** If the initial co-tenancy requirement was unsatisfied as of the rental commencement date, DSG had certain rights under the lease, including opening and paying substitute (or lesser) rent until the co-tenancy requirement was satisfied. Alternatively, DSG could delay its opening date and payment of any rent until 60 days after the co-tenancy requirement was satisfied and DSG received notice from Portfolio of that fact.  *Id.*, Section 1.6(b).  If DSG elected not to delay its opening date, it had the right to terminate the lease if the co-tenancy requirement was not satisfied within 18 months after the initial rental commencement date.  *Id.*, Section 1.6(c)(i).  If DSG chose to delay opening, it also had the right to terminate the lease if the initial co-tenancy requirement was not satisfied within 18 months.  *Id.* at p. 8, Section 1.6(c)(ii).

**{¶ 25}** Section 1.6(d) also imposed duties on Portfolio to provide DSG with written reports concerning the status of the original co-tenancy requirement until the requirement was satisfied.  The report was to be updated every 30 days until the rental commencement date.  *Id.*

{¶ 26} The parties did not dispute that the initial co-tenancy requirement was satisfied. They also agreed that the rent commencement date was in October 2016 and that DSG paid Minimum Rent and Additional Rent through February 2018. Complaint (Aug. 14, 2019), p. 3, ¶ 8, and First Amended Answer and Counterclaim (November 8, 2019), p. 3, ¶ 9.

{¶ 27} In addition to the initial co-tenancy requirement, the lease contained an ongoing co-tenancy requirement. This provision stated, in pertinent part, that:

(a) As used in this Section 1.7, the term **"Ongoing Co-Tenancy Requirement"** shall mean that: (i)(A) Kohl's; and (B) one (1) of the remaining Inducement Tenants or its Replacement Inducement Tenant (as hereinafter defined) shall be open, fully staffed, stocked and operated in substantially all of their respective premises, for the operation of a retail business (collectively, the "Major Co-Tenancy Requirement"); and (ii) at least (65%) of the LFA of the Shopping Center, excluding the LFA of the Demised Premises * * *, the Inducement Tenants (or applicable Replacement Inducement Tenant) satisfying subsection (i) above, and any out-parcels, shall be open, fully staffed, stocked and operated by an Occupant in substantially all its premises, for the operation of a retail business by a Required Tenant (the **"LFA Co-Tenancy Requirement"**).

(Bolding sic.) App. I, Lease at p. 8-9, Section 1.7(a).

{¶ 28} This section of the lease also provided remedies if either a major co-tenancy requirement or an LFA co-tenancy requirement was not satisfied. As relevant here,

Section 1.7 stated that:

(b)   If at any time after the Rental Commencement Date and the satisfaction or waiver of the Initial Co-Tenancy Requirement:

* * *

(ii)   the LFA Co-Tenancy Requirement is not satisfied (the **"LFA Co-Tenancy Violation"**), Tenant shall then pay to Landlord monthly, in lieu of Rent, in arrears, no later than the thirtieth (30th) day of the following month, Substitute Rent (defined in Section 1.5), during the period which extends from the beginning of the first full calendar month following the LFA Co-Tenancy Violation and continuing until the end of the calendar month in which such LFA Co-Tenancy Violation is satisfied.   In addition to the rights of Tenant to pay Substitute Rent, if the LPA Co-Tenancy Violation shall continue for a period in excess of twelve (12) months (the **"LFA Co-Tenancy Violation Period"**), Tenant shall either (i) terminate this Lease by written notice delivered to Landlord within sixty (60) days following the LFA Co-Tenancy Violation Period, effective thirty (30) calendar days from the date of such notice or (ii) resume the full payment of Rent in the first full calendar month to occur at least sixty (60) days after the LFA Co-Tenancy Violation Period.   If Tenant fails to deliver written notice to Landlord exercising such termination rights within sixty (60) days after the end of the LFA Co-Tenancy Violation Period, then such termination right shall be deemed waived and Tenant shall resume the full payment of Rent and

Tenant shall have no further rights under this Section 1.7(b)(ii) with respect to any further failure(s) of the LFA Co-Tenancy Requirement.

(Bolding sic.)   App. I, Lease at p. 9-10, Section 1.7(b).

{¶ 29} According to the summary judgment evidence, DSG paid the full amount of its rent for December 2017, January 2018, and February 2018.   Affidavit of David Barnes, attached as Appendix II to DSG's Response to Motion for Partial Summary Judgment ("Barnes Aff."), ¶ 11.   However, DSG learned in the spring of 2018 that BB&B was no longer operating in the Center and the ongoing co-tenancy requirement was no longer satisfied because 65% of the LFA in the Center was no longer open, fully staffed, stocked, and operable for the " 'operation of a retail business by a Required Tenant.' " *Id.* at ¶ 12, quoting Section 1.7(a) of the Lease.   DSG asked its local broker to confirm this, and he did, informing DSG that BB&B had closed on or about January 31, 2018, and that Portfolio had received BB&B's premises back on February 1, 2018.   *Id.* at ¶ 13.

{¶ 30} On February 27, 2018, Tim Fozzo, DSG's Director of Real Estate Administration and Market Research, sent Portfolio a letter stating, among other things, that:

Bed Bath and Beyond closed its store in the Shopping Center on January 31, 2018, which caused the applicable occupancy percentage to fall to 54.11% as of February 1, 2018 (The space formerly occupied by Bed Bath & Beyond is not one of the "inducement Tenants . . . satisfying subsection (i)," and is therefore part of the LFA considered in the LFA Co-Tenancy Requirement.).   I have enclosed a copy of DSG's occupancy

report showing the calculations. Therefore, the LFA Co-Tenancy Requirement was not satisfied as of February 1, 2018 and an LFA Co-Tenancy Violation occurred as of such date. Accordingly, pursuant to Section 1.7(b)(ii) of the Lease, DSG is entitled to pay Substitute Rent in lieu of Rent beginning as of March 1, 2018, and continuing until the end of the calendar month in which the LFA Co-Tenancy Violation is cured. DSG will begin paying Substitute Rent in lieu of Rent as of March 1, 2018."

Barnes Aff. at ¶ 14 and Ex. 2 (Fozzo letter) attached to the Barnes Aff., p. 2.

**{¶ 31}** DSG's rent during the original 10-year lease term was "minimum" rent of $12.00 per square foot of the LFA of its premises (or $480,000 per year), plus "additional" rent for common area maintenance ("CAM") and DSG's portion of real estate taxes. *See* App. I, Lease at p. 22-23, 24-25, and 44-45.

**{¶ 32}** DSG began paying Substitute Rent as of March 1, 2018, and continued to do so through February 2019. Complaint at p. 7-8, ¶ 21; Amended Answer and Counterclaim at p. 6, ¶ 21 and p. 15, ¶ 17. "Substitute Rent' was defined in Section 1.5(c)(i) of the Lease as "two (2%) percent of Gross Sales (as defined in Section 6.2), but never more than the Minimum Rent for that month that would otherwise have been payable for such calendar month * * * during the period which extends from the beginning of the first full calendar month following the date on which the Precluded Use Activity(ies) were commenced and continuing until the calendar month in which such Precluded Use Activity(ies) are ceased." App. I, Lease at p. 5.

**{¶ 33}** After receiving DSG's February 27, 2018 letter on or around the date on

which it was sent, Portfolio did not dispute or correct the date that DSG used for BB&B's closing. i.e., January 31, 2018. Barnes Aff. at p. 15; Eric Harbison Affidavit attached to the Portfolio Summary Judgment Motion, ¶ 4. Instead, Portfolio accepted the Substitute Rent and acted as if the LFA violation had begun on February 1, 2018. Barnes Aff. at ¶ 5.

{¶ 34} On December 19, 2018 (which was almost ten months later), Portfolio's attorney sent a letter to DSG concerning the "Ongoing Tenancy Requirement." *Id.* at ¶ 17. The letter stated, in pertinent part, that:

> Our client, the Landlord, asked us to contact you regarding DSG's unilateral decision to reduce its rental payments. * * * Your letter of February 27, 2018, announcing this decision asserts that after the departure of Bed, Bath & Beyond (BB&B), the Shopping Center no longer satisfies the Ongoing Co-Tenancy Requirement in DSG's Lease. The Landlord disagrees with DSG's assertion.

Ex. 3 attached to the Barnes Aff., p. 1.

{¶ 35} Portfolio's disagreement, however, was not about the date on which BB&B had closed its operations. Instead, Portfolio, through its counsel, argued that BB&B was excluded from the 65% computation of the LFA co-tenancy requirement. According to Portfolio, the leased footage of any of the three "Inducement Tenants" (BB&B, Kohl's, and Marshalls) was excluded under the 65% threshold requirement in Section 1.7(a)(ii) of the Lease so long as two of the other Inducement Tenants (Marshalls and either Kohl's or BB&B) remained open and operating. *See* Ex. 3 at p. 1-2.

**{¶ 36}** After making this argument, Portfolio's attorney then stated:

> Landlord is pleased to inform DSG that Harbor Freight has entered into a new lease for the former BB&B space. Harbor Freight expects to be open and operating in the space before the end of January 2019. Even if DSG's assertions about the existence of a LFA Co-Tenancy violation were correct – and they were not – Harbor Freight's opening and occupancy of the space timely cures any alleged violation of the LFA Co-Tenancy Requirement.

Ex. 3 at p. 2-3.

**{¶ 37}** No evidence was presented in the trial court about whether Harbor Freight did open on the expected (unspecified) January 2019 date, nor was any evidence presented about whether Harbor Freight qualified under the lease as either a "Replacement Inducement Tenant" or a "Required Tenant."

**{¶ 38}** Portfolio's failure to return or acknowledge any excess rent payments that DSG made in January and February 2018 was also inconsistent with a claim that BB&B closed on December 29, 2017. Barnes Aff. at ¶ 11. Had BB&B closed on December 29, 2017, DSG would have been entitled to pay substitute rent in those months, rather than the larger amount of minimum and additional rent it normally paid (and did pay).

**{¶ 39}** Barnes's affidavit further said that the ongoing co-tenancy violation had continued for more than 12 months, i.e., until at least February 1, 2019, and DSG therefore sent Portfolio a notice on March 18, 2019, stating that DSG was electing to terminate the lease. *Id.* at ¶ 18-19, and Ex. 4 attached to the Barnes Aff. The notice

said, among other things, that:

> As you are aware, the LFA Co-Tenancy Requirement has not been satisfied since February 1, 2018, and, as a result, Tenant has the right to terminate the Lease pursuant to Section 1.7(b)(ii) therefore during the period of time beginning as of February 1, 2019 and ending as of April 2, 2019.

Ex. 4 at p. 1.

**{¶ 40}** As noted, Portfolio's position is that due to BB&B's December 29, 2017 closing date, DSG had to deliver its written notice of lease termination by February 27, 2019. This would have been the 60th day after the 12-month LFA co-tenancy violation on December 29, 2018. *See* Portfolio's Memorandum in Support of Partial Summary Judgment Motion at p. 6 and Appellees' Brief, p. 1-3. Portfolio did not take this position in responding to DSG's termination notice, however. Instead, Portfolio responded on March 22, 2019, as follows:

> Your letter of March 18, 2019 purports to give timely notice of DSG's election to terminate the lease under section 1.7(b)(ii). The Landlord disagrees with DSG's contention that the LFA Co-Tenancy Requirement has not been satisfied since February 1, 2018. DSG does not have the right to terminate the Lease under section 1.7(b)(ii), and DSG's purported notice of termination is ineffective.

Barnes Aff. at ¶ 20 and Ex. 5 attached to the Barnes Aff., p. 1.

**{¶ 41}** Again, in this letter, Portfolio did not contend that the notice was untimely; instead, Portfolio once more relied on the fact that no violation existed. The first

indication that Portfolio made about a different closing date, i.e., the December 29, 2017 closing date, was on August 14, 2019, when Portfolio filed the current lawsuit against DSG. *See* Complaint (Aug. 14, 2019) at ¶ 6. This was also the first time Portfolio asserted that the time for sending a termination notice was February 27, 2019, and that DSG's March 18, 2019 notice was untimely. *Id.* at ¶ 16. *See also* Barnes Aff. at ¶ 19-21.

**{¶ 42}** Barnes, who was DSG's vice-president and former in-house legal counsel with personal knowledge of the matter, stated that DSG "necessarily relies on its landlords for information about co-tenancy because information about closures and operations of other tenants is within landlords' control and not equally available to DSG." *Id.* at ¶ 1 and 10. Barnes further stated that DSG had relied on Portfolio's conduct in this case, including Portfolio's acceptance of substitute rent and failure to dispute that BB&B had closed operations on January 31, 2018. *Id.* at ¶ 16.

**{¶ 43}** "Ordinarily in business transactions where parties deal at arm's length, each party is presumed to have the opportunity to ascertain relevant facts available to others similarly situated and, therefore, neither party has a duty to disclose material information to the other." (Citation omitted.) *Blon v. Bank One, Akron, N.A.*, 35 Ohio St.3d 98, 101, 519 N.E.2d 363 (1988). In certain circumstances, however, courts have found a duty, such as where the parties have a fiduciary relationship or even an implied understanding that a confidential or special trust has been imposed. *Id.* "Full disclosure may also be required of a party to a business transaction 'where such disclosure is necessary to dispel misleading impressions that are or might have been created by partial revelation of the

facts.' " *Id.*, quoting *Connelly v. Balkwill*, 174 F.Supp. 49, 58 (N.D.Ohio 1959). (Other citations omitted.)

**{¶ 44}** According to Portfolio, even if a misrepresentation existed, there were several reasons why DSG could not have reasonably relied in good faith on the January 31, 2018 date. Specifically, Portfolio argues that DSG relied on a source other than Portfolio for that date; neither party could have known on February 27, 2018, that the co-tenancy violation would last for 12 months; DSG did not rely on Portfolio's silence as to BB&B's closing date before it delivered the February 27, 2018 letter; and DSG had nearly a year to discover the true state of affairs. Appellee's Brief at p. 23-25. Portfolio also contends that it had no duty to speak.

**{¶ 45}** These arguments miss the point, however. The fact that a co-tenancy violation might not exist for 12 months is irrelevant. At the time of the February 27, 2018 letter, DSG was simply providing notice that a violation existed and that it would pay lesser rent due to the violation. DSG recited a specific date for BB&B's closure in this letter, and Portfolio never corrected DSG's statement, even though the parties had numerous communications thereafter. Consequently, DSG had no reason to think the date in its February 27, 2018 letter was inaccurate or that it needed to investigate further.

**{¶ 46}** Moreover, when DSG wrote the February 2018 letter, it would have had no reason to consider Portfolio's "silence" as to BB&B's closing date. At the time, DSG had no reason to believe that its own information about the closing date was inaccurate. It also had no reason to question that date thereafter.

**{¶ 47}** Portfolio's actions also could be reasonably interpreted as deliberately

concealing a fact. In its brief, Portfolio argues that the trial court's decision was correct because DSG failed to present evidence that Portfolio knew that BB&B had closed its doors when DSG paid full rent in January and February 2018. Appellee's Brief at p. 25. This argument is without merit. As the landlord, Portfolio would certainly have been aware that a tenant had closed its store; it is hard to imagine otherwise.

{¶ 48} Portfolio also accepted DSG rent payments that were inconsistent with its contention that BB&B's store had closed on December 29, 2017. If BB&B had closed at that time, DSG would have been entitled to pay lesser rent beginning in January 2018. However, DSG paid full rent for January and February 2018, and Portfolio accepted the full amounts. Again, at the time, Portfolio would have been aware that its own tenant had closed in December 2017.

{¶ 49} As a further point, Portfolio's December 19, 2018 letter to DSG was consistent with and confirmed DSG's prior assertion that the BB&B closure had occurred on January 28, 2018. Portfolio's letter disputed the merits of DSG's statement that a co-tenancy violation existed due to BB&B's closure. However, the letter also stressed that even if such a violation had occurred, it would be timely cured by Harbor Freight's opening and occupancy "before the end of January 2019." Ex. 3 at p. 2.

{¶ 50} Specifically, if BB&B had closed on December 29, 2017, as Portfolio now asserts, any Harbor Freight opening *after* December 30, 2018, would not have cured the alleged co-tenancy violation. This is because under the Lease, DSG had the right to tender substitute rent the first full month after the violation began and had the right to terminate the lease "if the LFA Co-Tenancy Violation shall continue for a period in excess

of twelve (12) months (the **'LFA Co-Tenancy Violation Period'**).” (Bolding sic.) App. I, Lease at p. 9, Section 7.1(b)(ii). If the violation occurred on December 29, 2017, the 12-month period would have expired on December 30, 2018. Any opening date after that would have exceeded 12 months.

{¶ 51} Portfolio's letter to DSG was dated December 19, 2018. If the co-tenancy violation would have been timely cured before 12 months after the December 29, 2017 closing of BB&B, Portfolio would have said so. Instead, Portfolio referenced a date (the end of January 2019) that was clearly after that point. Because Portfolio would have been aware, under any stretch of the imagination, of the date when its own tenant (BB&B) had vacated its store and turned over possession, one could reasonably conclude that Portfolio was aware of DSG's mistake and of the short timeline for giving notice of termination, and it intended to lull DSG into missing the deadline. As noted, DSG had no reason to further investigate since its assertion of the January 28, 2018 closing date had never been corrected or challenged.

{¶ 52} While Portfolio argues that it had no duty to speak, it certainly had a duty in December 2018 not to reinforce DSG's mistaken impression by specifically referencing a date that fit DSG's mistake and clearly did not fit the December 29, 2017 BB&B closing date. DSG was obviously prejudiced because untimely notice of termination subjected it to more than $2,000,000 in damages and attorney fees.

{¶ 53} Portfolio has also argued that DSG had the right under Section 13.2 of the Lease to demand a refund of the January and February 2018 overpayments. Appellee's Brief at p. 8. However, this again misses the point. Section 13.2 provides certain “self-

help" remedies, including deductions from rent or from post-judgment amounts, if Portfolio defaulted on lease agreements or conditions and failed to cure the default after being provided 30 days written notice. App. I, Lease at p. 42. Since DSG was operating under the impression that its closure date was correct, there was no reason for it to demand reimbursement for full rental payments it thought had been correctly made.

{¶ 54} Portfolio is correct in pointing out that the lease gave DSG the right to ask it for the LFA of each of the Center's occupants and the right to audit and inspect Portfolio's records concerning the on-going co-tenancy requirements. *See* Appellee's Brief at p. 20-21, referencing Lease at p. 10, Section 1.7(d). Again, given Portfolio's actions, DSG would not have been aware of the need to ask for an audit, because the date when BB&B left (and a co-tenancy violation occurred) did not appear to be disputed.

{¶ 55} We also agree that both parties were sophisticated business entities. However, that factor is somewhat immaterial here. Again, even if DSG was a sophisticated entity, it had no reason to investigate further since BB&B's closing date appeared to be undisputed.

{¶ 56} Based on the preceding discussion, genuine issues of material fact existed concerning whether Portfolio should be equitably estopped from claiming that the notice of termination was untimely. Accordingly, DSG's first assignment of error is sustained.

### III. Affirmative Defense of Waiver

{¶ 57} DSG's second assignment of error states that:

> The Trial Court Erred in Granting Summary Judgment on DSG's

Affirmative Defense That Landlord Waived Its Rights to Assert that the LFA Co-Tenancy Violation Began at an Earlier Date.

**{¶ 58}** Under this assignment of error, DSG contends that the trial court's observation about some of Portfolio's inconsistent acts should have been enough to deny summary judgment. Appellant's Brief, p. 18. In addition, DSG claims that the trial court should not have relied on *White* to dispose of this case as a matter of law. *Id.*, discussing *White*, 131 Ohio St. 190, 2 N.E.2d 501. This is because *White* was decided after trial (not on summary judgment), and the Supreme Court of Ohio also did not resolve the \waiver issue. *Id.*

**{¶ 59}** Portfolio did not specifically respond to these points in its brief. Furthermore, Portfolio combined its discussion of waiver and estoppel without acknowledging that these are different doctrines. *See* Appellee's Brief at p. 17-25. In any event, Portfolio argues that it cannot be held liable because its deeds must be "clear" and "decisive," and liability cannot be based on inferences drawn from "equivocal" acts. *Id.* at p. 23.

**{¶ 60}** In *White*, the plaintiff filed a replevin action against the defendant, seeking possession of a bus the defendant had purchased. After trial, the jury found that the defendant was entitled to possession of the bus and had incurred $2,500 in damages. *Id.* at 196. On appeal, the Supreme Court of Ohio reversed, finding that the case, including the defendant's waiver claim, should not have been submitted to the jury. The court, therefore, issued judgment for the plaintiff. *Id.* at 200.

**{¶ 61}** In its opinion, the court discussed waiver generally and noted, as the trial

court here stated, that the defendant "was required to prove a clear, unequivocal, decisive act of the party against whom the waiver was asserted * * *." *Id.* at 198-199, citing 27 Ruling Case Law, 909 and 910, Section 5. However, the court also found it did not need to decide the waiver issue. This was because even if the court accepted the contract as it was alleged to have been modified, the defendant had failed to comply with the modified contract. *Id.* at 200.

**{¶ 62}** The fact that *White* differs factually from the circumstances here does not mean the pertinent legal principle is incorrect. This waiver principle has been cited in other cases and is a long-established rule. *E.g., Monreal Funeral Home, Inc. v. Farmers Ins. Co.*, 189 Ohio App.3d 1, 2010-Ohio-3805, 937 N.E.2d 159, ¶ 26 (11th Dist.); *Accurate Elec. Constr., Inc. v. Ohio State Univ.*, 2019-Ohio-4992, 149 N.E.3d 1080, ¶ 60 (10th Dist.).

**{¶ 63}** Nonetheless, the law is also settled that " 'a party, by words or conduct, may waive the terms of a written contract.' " *Automated Solutions Corp. v. Paragon Data Sys., Inc.*, 167 Ohio App.3d 685, 2006-Ohio-3492, 856 N.E.2d 1008, ¶ 28 (8th Dist.), quoting *Cincinnati Gas & Elec. v. Land*, 12th Dist. Butler No. CA91-06-111, 1992 WL 50027 (Mar. 16, 1992). *See also Colonial Consultants, Inc. v. David R. Zelnick Properties, Inc.*, 2d Dist. Montgomery No. CA-6853, 1981 WL 2706, *5 (Mar. 4, 1981) (intentional relinquishment of known right "need not be express, but may be implied from the facts"); *Muransky v. Miller*, 2d Dist. Montgomery No. 28622, 2020-Ohio-4595, ¶ 15 (whether "waiver is expressed or implied, it must be intentional").

**{¶ 64}** Having reviewed the record, we disagree with Portfolio's position. In the

first place, its actions were neither "equivocal" nor unclear. As noted, Portfolio's letter in December 2018 reinforced the BB&B closing date that DSG had previously referenced. And, for the reasons previously noted, there are, at a minimum, genuine issues of material fact concerning whether waiver occurred.

{¶ 65} The trial court relied on the fact that the parties' lease contained anti-waiver provisions (Sections 12.2(e) and 17.5) but did not discuss either the content of these provisions or the applicable law. Partial Summary Judgment Entry (July 14, 2021), at p. 3.

{¶ 66} In its brief, DSG argues that the trial court erred in holding that the anti-waiver provisions negated any implication of waiver. Appellant's Brief at p. 20. According to DSG, neither provision applied to its waiver argument, and the circumstances here fell outside their scope. In responding to DSG's brief, Portfolio did not address the lease's anti-waiver provisions.

{¶ 67} "Typically, anti-waiver clauses serve to protect a party when it has previously accepted a late payment or failed to exercise a remedy when the agreement was earlier breached." *Fields Excavating, Inc. v. McWane, Inc.*, 12th Dist. Clermont No. CA2008-12-114, 2009-Ohio-5925, ¶ 31. However, "* * * written waiver provisions, like any other contractual provision, can be waived by the parties." (Citations omitted.) *3637 Green Rd. Co. v. Specialized Component Sales Co.*, 2016-Ohio-5324, 69 N.E.3d 1083, ¶ 22 (8th Dist.). "[W]aiver of a contract term can occur when a party conducts itself in a manner inconsistent with an intention to insist on that term." *Vivi Retail, Inc. v. E & A Northeast Ltd. Partnership*, 8th Dist. Cuyahoga No. 90527, 2008-Ohio-4705, ¶ 30, citing

*Convenient Food Mart Inc. v. Atwell,* 11th Dist. Lake No. 2003-L-174, 2005-Ohio-704. *See also* 13 Williston on Contracts 39:36 (4th Ed.) ("The general view is that a party to a written contract can waive a provision of that contract by conduct despite the existence of a so-called antiwaiver or failure to enforce clause in the contract.").

**{¶ 68}** As relevant here, Section 12.2 of the Lease is contained in Article XII (Default) and is titled "Remedies." Section 12.2(e) provides that:

> No failure by either Party to insist upon the strict performance by the other Party of any covenant, agreement, term or condition of this Lease or to exercise any right or remedy consequent upon a breach thereof, shall constitute a waiver of any such breach or of such covenant, agreement, term or condition. No consent or waiver, express or implied, by either Party to or of any breach of any covenant, condition or duty of the other Party shall be construed as a consent or waiver to or of any other breach of the same or any other covenant, condition or duty, unless in writing signed by such Party.

App. I, Lease at p. 40.

**{¶ 69}** Section 17.5 is in Article XVII of the Lease, which is titled "Interpretation." Section 17.5, itself, is titled "Waivers." The content in this section is similar to Section 12.2(e), and states, in pertinent part, that:

> Failure of either Party to complain of any act or omission on the part of the other Party, no matter how long the same may continue, shall not be deemed to be a waiver by such Party of any of its rights hereunder. No

waiver by either Party at any time, express or implied, of any breach of any provision of this Lease shall be deemed a waiver of any other provision of this Lease or a consent to any subsequent breach of the same or any other obligation.

App. I, Lease at p. 52.

{¶ 70} These provisions do not apply to the situation before us. As we explained earlier, Portfolio's stated position (before suit was filed) was that DSG had breached the contract by paying substitute rent and by terminating the lease. This position was based on Portfolio's claim that BB&B's closing had not impacted the requirement that "at least sixty-five percent (65%) of the LFA of the Shopping Center, excluding the LFA of the Demised Premises * * *, the Inducement Tenants (or applicable Replacement Inducement Tenant) * * * and any out-parcels, shall be open, fully staffed, stocked and operated by an Occupant in substantially all its premises, for the operation of a retail business by a Required Tenant." App. I, Lease at p. 9, Section 1.7(a).

{¶ 71} In that situation, the anti-waiver provisions could apply if Portfolio had agreed to accept or had accepted substitute rent despite the alleged breach, had subsequently refused to accept further substitute rent, and had then sued for that later alleged breach. *Compare Gaul v. Olympia Fitness Ctr., Inc.*, 88 Ohio App.3d 310, 316-317, 623 N.E.2d 1281 (8th Dist.1993) (mortgagor may have waived right to pursue some remedies based on late payments that were intended to "cure" defaults but did not waive defaults that occurred after the prior "cured" defaults); *Buckeye Retirement Co. v. Walling*, 7th Dist. Mahoning No. 05 MA 119, 2006-Ohio-7059, ¶ 24 (despite accepting late

payments, bank did not waive right to accelerate and foreclose on mortgage where a subsequent default occurred and loan documents contained an anti-waiver provision).

{¶ 72} Thus, waiver would not necessarily have prevented Portfolio from litigating whether BB&B's closing impacted the 65% occupancy requirement.[1]  However, much like estoppel, wavier could prevent Portfolio from challenging the date that DSG gave notice of its right to terminate.   Accordingly, the second assignment of error is sustained.

## IV.   LFA Co-Tenancy Period

{¶ 73} DSG's third assignment of error states that:

The Trial Court Erred in Interpreting §1.7(b) as Limiting the "LFA Co-Tenancy Period" to Exactly Twelve Months Despite the Term Being Expressly Defined as a "Period in *Excess* of Twelve (12) Months. (Emphasis sic.)

{¶ 74} Under this assignment of error, DSG contends that the trial court erred in confining the violation period in Section 1.7(b) to exactly 12 months.   According to DSG, because the violation period in Section 1.7(b)(ii) requires a violation period "in excess" of 12 months, but establishes no specific time, there is no explicit end date for the violation period.   Therefore, DSG's March 18, 2019 notice of termination was timely because it was filed within 60 days after Harbor Freight's occupation at the end of January 2019. However, no evidence was presented in the trial court concerning the actual date Harbor

---

[1] Ironically, this was not the ground on which Portfolio's complaint or summary judgment motion was based.  Instead, Portfolio relied solely on DSG's failure to provide timely notice of its intention to terminate.  *See* Complaint, generally, and Portfolio's Memorandum in Support of Motion for Summary Judgment, p. 3-4.

Freight took possession and opened, nor was any evidence presented concerning whether it satisfied the lease requirements for inducement or required tenants. According to Portfolio, DSG waived this contractual argument by failing to raise it in the trial court.

{¶ 75} The trial court did not specifically discuss the meaning of Section 1.7 but simply adopted Portfolio's timeline that "the twelve (12) month violation period would have expired on December 30, 2018 and the sixty (60) day period within which DSG could exercise its right to terminate the Lease would have expired on February 27, 2019." Partial Summary Judgment Entry at p. 2.

{¶ 76} Having reviewed the record, we agree that this issue was not raised in the trial court. Generally, "[a]n appellate court will not consider any error which a party complaining of a trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court." *LeFort v. Century 21-Maitland Realty Co.*, 32 Ohio St.3d 121, 123, 512 N.E.2d 640 (1987), citing *Stores Realty Co. v. Cleveland*, 41 Ohio St.2d 41, 322 N.E.2d 629 (1975). *Accord Hicks v. State Farm Mut. Auto. Ins. Co.*, 2017-Ohio-7095, 95 N.E.3d 852, ¶ 70 (2d Dist.). We can consider plain error even in this situation, however. *Hicks* at ¶ 71.

{¶ 77} We need not consider plain error here. Since this case is being reversed, the parties will be able to raise any issues they choose on remand. Accordingly, the third assignment of error is overruled as moot.

V.   Accommodation of Separate Lease Lights

{¶ 78} DSG's fourth assignment of error states that:

The Trial Court Erred in Imposing a Termination Deadline Under §1.7(b) as Running 60 Days After the 12th Month of an LFA Co-Tenancy Violation, When the Lease Affords Tenant Ongoing Rights to Terminate and Pay Substitute Rent Until the Underlying Requirement is Satisfied.

{¶ 79} Under this assignment of error, DSG argues that the trial court's interpretation contradicted the Lease's express language and deprived DSG of the right to pay substitute rent until a co-tenancy violation had been satisfied.   Specifically, under Section 1.7(b)(ii), it argues that DSG had the right to pay substitute rent until the end of the calendar month in which the co-tenancy requirement was satisfied.  *See* App. I, Lease at p. 9, Section 1.7(b)(ii).   However, the Lease gave DSG the additional right to terminate the lease if the violation continued in excess of 12 months.   According to DSG, the lease must be read in a manner to accommodate both rights.

{¶ 80} Again, Portfolio responds that this issue was not raised in the trial court. We agree.   As noted, the trial court must be given the chance to address issues before they can be raised on appeal.   While we can consider such issues under the plain error doctrine, there is no need to do that here, given the remand.   Accordingly, the fourth assignment of error is overruled as moot.

V.   Conclusion

{¶ 81} DSG's first and second assignments of error having been sustained, and

the third and fourth assignment of error having been overruled as moot, the judgment of the trial court is reversed. This matter is remanded to the trial court for further proceedings.

. . . . . . . . . . . .

TUCKER, J. and LEWIS, J., concur.